Slade R. Metcalf (SM 8360)
Katherine M. Bolger (KB 6206)
Rachel F. Strom (RS 9666)
Hogan & Hartson LLP
875 Third Avenue
New York, NY  10022
Telephone: (212) 918-3000
*Attorneys for Defendants Monica Levinson,*
*Twentieth Century Fox Film Corporation,*
*One America Productions, Inc., Todd Schulman,*
*Sacha Baron Cohen, Larry Charles, Jay Roach*
*Everyman Pictures, Springland Films,*
*Dune Entertainment, LLC, Comedy Partners,*
*Dakota North Entertainment, Inc., and*
*Four by Two Production Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
Kathie Martin,                                                    :
                                                                 :
                          Plaintiff,                             :
                                                                 :
              – against –                                        :     Case No. 08 CV 1828 (LAP)
                                                                 :
Dan Mazer, Anthony Hines, Larry Charles,                         :
Peter Baynham, Monica Levinson, Jay                              :
Roach, Todd Phillips, Everyman Pictures,                         :
Twentieth Century Fox Film Corporation,                          :
One America Productions, Inc., Gold/Miller                       :
Productions, Springland Films, Dune                              :
Entertainment, LLC, MTV Networks d/b/a                           :
Comedy Central, Dakota North                                     :
Entertainment, Inc., Four by Two                                 :
Production Company, Sacha Baron Cohen,                           :
Todd Schulman, and John Does Nos. 1-5,                           :
                                                                 :
                          Defendants.                            :
--------------------------------------------------------------------X

## DECLARATION OF SLADE R. METCALF IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

I, **SLADE R. METCALF**, declare as follows:

1.      I am a partner in the law firm of Hogan & Hartson LLP, counsel for defendants

Monica Levinson ("Levinson"), Twentieth Century Fox Film Corporation ("Fox"), One America Productions, Inc. ("One America"), Todd Schulman ("Schulman"), Sacha Baron Cohen ("Cohen"), Larry Charles ("Charles"), Jay Roach ("Roach"), Everyman Pictures ("Everyman"), Springland Films ("Springland"), Dune Entertainment LLC ("Dune"), Comedy Partners (incorrectly sued herein as "MTV Networks d/b/a Comedy Central"), Dakota North Entertainment, Inc. ("Dakota") and Four by Two Production Company ("Four by Two") (collectively, "Defendants").  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.  I submit this Declaration in support of Defendants' Motion to Dismiss the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.      On October 22, 2007, Plaintiff filed a summons with notice in the Supreme Court of the State of New York, County of New York.

3.      On February 22, 2008, Fox, One America, Levinson and Schulman, the only Defendants served in this action at that time, removed this action to this Court.

4.      Subsequently, my firm accepted service of the summons with notice on behalf of Defendants Cohen, Charles, Roach, Everyman, Springland, Dune, MTV d/b/a Comedy Central, Dakota and Four by Two.

5.      On March 28, 2008, Plaintiff filed a complaint in this action (the "Original Complaint").  (A true and correct copy of the Original Complaint is annexed hereto as Exhibit "A").  Plaintiff annexed a copy of a release that she entered into with Springland (the "Release") as Exhibit A to the Original Complaint.  (For the convenience of the Court, a true and correct copy of the Release, as annexed to Original Complaint, is annexed hereto as Exhibit "B").

6.      On April 11, 2008, Plaintiff filed the First Amended Complaint.  (A true and

2

correct copy of the First Amended Complaint is annexed hereto as Exhibit "C").

7.      Pursuant to a stipulation among the parties, so ordered by this Court on January April 23, 2008, Defendants have until May 5, 2008 to move, answer or otherwise respond to the Complaint.  (A true and correct copy of the stipulation is annexed hereto as Exhibit "D").

I declare under the penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct and that this Declaration was executed in New York, New York on May 5, 2008.


  s/  Slade R. Metcalf
       **SLADE R. METCALF**

\\\NY - 027721/000006 - 1082139 v1

<u>**EXHIBIT A**</u>

**To the Declaration of Slade R. Metcalf
in Support of Defendants' Motion To Dismiss the First Amended Complaint**

ADAM RICHARDS LLP
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@arichardslaw.com

Attorneys for Plaintiff Kathie Martin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Kathie Martin,

                              Plaintiff,

             - against -

Dan Mazer, Anthony Hines, Larry Charles,
Peter Baynham, Monica Levinson, Jay Roach,
Todd Phillips, Everyman Pictures, Twentieth
Century Fox Film Corporation, One America
Productions, Inc., Gold/Miller Productions,
Springland Films, Dune Entertainment, LLC,
MTV Networks d/b/a Comedy Central, Dakota
North Entertainment, Inc., Four by Two
Production Company, Sacha Baron Cohen,
Todd Schulman, and John Does Nos. 1-5,

                              Defendants.



**Index No. 08 CV 1828 (LAP)**

**COMPLAINT**

Plaintiff Kathie Martin ("Mrs. Martin" or "Plaintiff"), by and through her undersigned

counsel, brings this Complaint against defendants Sacha Baron Cohen, Twentieth Century Fox

Film Corporation, One America Productions, Inc., Everyman Pictures, Gold/Miller Productions,

Springland Films, Todd Schulman, Dune Entertainment, LLC, MTV Networks d/b/a Comedy

Central, Dakota North Entertainment, Inc., Four by Two Production Company and fictitious

defendants John Does Nos. 1 through 5 (collectively "Defendants") and alleges the following:

1. This lawsuit arises from the fraudulently obtained appearance of Mrs. Martin in the recently released movie "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*" (the "*Borat* Movie") and the knowing, intentional, negligent and/or reckless acts Defendants committed against Mrs. Martin. Mrs. Martin, who owns an etiquette training business for children and adults, was victimized and later exploited by Defendants. Defendants, under false pretenses, fraudulently induced Mrs. Martin to participate in what was represented to Mrs. Martin as being a "documentary-style film" and to be filmed under the guise of conducting a dining etiquette training class for a foreign reporter filming a "documentary for Belarus Television." The *Borat* Movie carries an R-rating and contains scenes that are anti-Semitic, sexist, racist, and depict graphic nudity, vulgarity and, specific to Mrs. Martin's scenes in the *Borat* Movie, child pornography. The *Borat* Movie is a far cry from a "documentary for Belarus Television" and, without Defendants' wrongful conduct described herein, Mrs. Martin would never have associated herself with the *Borat* Movie.

2. Apparently not everyone in the film was manipulated and treated as underhandedly and deceptively as Mrs. Martin. Paid professional actresses, such as Pamela Anderson, were aware of the theme and plot of the *Borat* Movie and were allowed to make an informed decision about whether to be filmed. Mrs. Martin was not given any true information about the filming. Instead, through fraud and deceit, Defendants hijacked Mrs. Martin's name, image, likeness and goodwill and used them in an R-rated blockbuster movie without her permission. In short, Defendants' actions toward Mrs. Martin were designed to evade meaningful consent and, thereby, subject her to ridicule for the sole purpose of enriching Defendants at her expense. Mrs. Martin neither would have agreed to appear in such a distasteful film nor participate in the massive public debate spawned by the *Borat* Movie.

**PARTIES**

3. Mrs. Martin is an individual residing in Jefferson County, Alabama.

4. Defendant Sacha Baron Cohen ("Cohen") is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie.

5. Defendant Twentieth Century Fox Film Corporation ("Defendant Twentieth Century Fox") is a Delaware corporation with its principal place of business in Los Angeles County, California and filmed, produced and distributed the *Borat* Movie.

6. Defendant One America Productions, Inc. ("Defendant One America") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

7. Defendant Everyman Pictures ("Defendant Everyman") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

8. Defendant Gold/Miller Productions ("Defendant Gold/Miller") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

9. Defendant Springland Films ("Defendant Springland") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

10. Defendant Todd Schulman ("Schulman"), upon information and belief, resides in Los Angeles County, California and participated in the filming, production and/or distribution of the *Borat* Movie.

3

11. Defendant Dune Entertainment, LLC ("Defendant Dune") is a Delaware corporation with its principal place of business in Suffolk County, New York that participated in the filming, production and/or distribution of the *Borat* Movie.

12. Defendant MTV Networks d/b/a Comedy Central ("Defendant Comedy Central") is a Delaware corporation that provides television programming and that participated in the filming, production and/or distribution of the *Borat* Movie.

13. Defendant Dakota North Entertainment, Inc. ("Defendant Dakota North") is an out of state entity responsible for and/or involved with "*Reel Comedy: Borat Special*", a show airing on Defendant Comedy Central that participated in the filming, production and/or distribution of the *Borat* Movie.

14. Defendant Four by Two Production Company ("Defendant Four by Two") is a California corporation that participated in the filming, production and/or distribution of the *Borat* Movie.

15. Fictitious Party Defendants John Does 1 through 5, whether singular or plural, are those individuals, corporations or other entities who, alone or in concert with others, operated to plan, commit or otherwise facilitate the conduct and/or practices that is the subject of this Complaint, and whose identities are presently unknown but will be added when their identities can be ascertained.

## JURISDICTION AND VENUE

16. Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants Monica Levinson, Twentieth Century Fox Film Corporation, One America Productions and Todd Schulman removed this action to this court from the Supreme Court of the State of New York, County of New York.

17. This Court has jurisdiction over the action pursuant to 28 U.S.C §1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b), because under the terms of a "standard consent agreement" which Mrs. Martin was fraudulently induced to enter into with Defendant One America Productions, any claim brought in connection with the *Borat Movie* must be "brought before and adjudicated by only a competent court located in the State of New York and County of New York."

## FACTUAL BACKGROUND

20. Mrs. Martin owns and operates The Etiquette School of Birmingham in Birmingham, Alabama. The focus of her business is etiquette training for children and adults, including corporate groups.

21. Mrs. Martin also is employed by Alabama Public Television, a non-commercial television station designed to "motivate children to learn, empower students and teachers to succeed, and provide a lifelong path to knowledge" and "committed to the values of honesty, fairness, civility and ethics in [their] programming and [their] everyday interaction with viewers, volunteers, co-workers, funding partners, and the community at large." *See* Alabama Public Television Website *available at* http://www.aptv.org/Inside/mission.asp.

22. In or about October 2005, Schulman telephoned Mrs. Martin and identified himself as "Todd Lewis". Schulman told Mrs. Martin that he had located the Etiquette School of Birmingham on the Internet and asked about the type of etiquette training she offered. Among other classes, Mrs. Martin told Schulman that she offered dining etiquette training.

23. Schulman told Mrs. Martin that he worked for Defendant Springland and that they were assisting a reporter from a former Soviet Bloc country ("Foreign Reporter"). The Foreign Reporter's name was not provided.

5

24. Schulman told Mrs. Martin that Defendant Springland was filming the Foreign Reporter's travels and experiences in the United States for a documentary to be created for and shown on Belarus Television.

25. Schulman then came to Mrs. Martin's home in Birmingham, Alabama, where he repeated the story about the Foreign Reporter and videotaped Mrs. Martin.

26. Schulman scheduled a dining etiquette training class ("Class") with Mrs. Martin for the Foreign Reporter that was to be conducted at her home on or about October 23, 2005. A fee of $300 was agreed upon to cover the cost of the Class.

27. In preparation for the Class, Mrs. Martin spent several hours researching Russian customs and culture as well as Belarus Television. Mrs. Martin did not want to do or say anything to offend the Foreign Reporter.

28. On the day of the Class, Mrs. Martin prepared a meal at her home, set her table and arranged for her husband to serve the meal during the Class with the Foreign Reporter. Schulman was the first to arrive at Mrs. Martin's home before the Class. While they were waiting for the film crew to arrive, Mrs. Martin and her husband, Mr. Ray Martin, talked with Schulman about Defendant Springland.

29. In the course of conversation, Schulman attributed the Da Ali G Show[1] to Defendant Springland. Mr. Martin had some vague knowledge of the Ali G character but Schulman assured the Martins that the segment Defendant Springland was filming with Mrs. Martin would not be anything like the Da Ali G Show. The Martins did not have any familiarity with Defendant Cohen or the Borat character portrayed by Defendant Cohen on the Da Ali G Show.

---

[1] Unbeknownst to the Martins at the time, the Da Ali G Show regularly appears on HBO and consists of various characters portrayed by Cohen (including a character known as Borat) who prey on unsuspecting guests.

30. Following this assurance, Schulman excused himself and stepped outside of the Martin's home. He told the Martins that it was his sister's birthday and he needed to wish her a happy birthday.

31. Meanwhile, the camera crew and director arrived to set up for filming at Mrs. Martin's home. Schulman came back inside and said that the director wanted Mr. Martin and Mrs. Martin's young daughter to go outside before the Foreign Reporter arrived and during the filming. Mrs. Martin assumed that the director thought her daughter might interfere with the filming in some way. Mrs. Martin explained to Schulman that Mr. Martin needed to remain inside to serve the food for the Class. Mrs. Martin assured Schulman that her daughter would stay upstairs in her room and not interfere with the filming.

32. After some discussion between Schulman and the director, Schulman approached Mrs. Martin and said that they were having trouble with the time code on one of the cameras. Schulman told Mrs. Martin that another camera was on its way, but that it would not arrive in time to conduct and film the Class that day. Schulman requested that they reschedule the Class for the following day. Upon information and belief, Defendants staged the need to re-schedule in order to ensure that Mr. Martin would not be present for filming for fear that he may recognize the similarity between the Foreign Reporter and the characters portrayed by Cohen on the Da Ali G Show. Defendants were successful; given the re-scheduling from Sunday to Monday, Mr. Martin was unable to attend the make-up Class and filming.

33. The Class was rescheduled for the following day, October 24, 2005, at the Tutwiler Hotel in Birmingham, Alabama. Shortly after Mrs. Martin arrived at the Tutwiler Hotel, Schulman handed Mrs. Martin a Standard Consent Agreement. Schulman said it was a standard filming release form. Based upon Schulman's previous representations concerning, among other things,

7

his identify as "Todd Lewis", the Foreign Reporter, the nature of the Class and filming and the intended audience, Mrs. Martin signed the form and requested a copy. *See* Exhibit A.

34. Schulman gave Mrs. Martin $350.00. Mrs. Martin and Defendant Schulman had previously agreed on a $300.00 fee for the Class and Schulman gave her an additional $50.00 for the cost of the meal she had prepared at her home the day before.

35. Schulman took Mrs. Martin to the filming area where she was introduced (for the first time) to the Foreign Reporter (in reality, Cohen), and Defendant Springland began filming for what Mrs. Martin had been told was a documentary for broadcast on Belarus Television.

36. During the Class, Mrs. Martin was highly offended by Cohen but she attempted to be respectful. For example, Cohen suggested to Mrs. Martin that "now is the time that we have sexual intercourse." Stunned and shaken, Mrs. Martin politely declined and attempted to direct the conversation back to the subject of the Class – dining etiquette. Mrs. Martin attributed the comment to the Foreign Reporter's extreme cultural ignorance.

37. Cohen did not stop there. Instead, he continued to make highly offensive sexist comments and insults directed at people of the Jewish faith. The latter subject was particularly upsetting to Mrs. Martin given the very recent death of one of her close friends who was of the Jewish faith. Undaunted, Cohen repeatedly attempted to bait Mrs. Martin into agreeing with his derogatory comments.

38. Although Mrs. Martin was truly repulsed by the Foreign Reporter, she attempted to calmly explain to Cohen the offensive nature of such comments and behavior in America and bring the Class to a close.

39. The situation only got worse. Cohen showed Mrs. Martin pictures of what he represented to be his family. She was shocked and embarrassed to be shown a series of pornographic

8

pictures by Cohen of his son, who she remembers him saying was fifteen (15) years old. The pictures of Cohen's son depicted a boy exposed from the waist down and focused on the child's penis.

40. Cohen boasted about his son "being strong," an obvious reference to the penis. One of the pictures showed Cohen's head very close to the penis with a "thumbs up" sign.

41. Mrs. Martin was terribly upset and shaken by the outrageous behavior of Cohen yet she tried to remain calm and not offend the "Foreign Reporter."

42. After the filming was over, and obviously recognizing how shaken she was, the director asked Mrs. Martin what was in the pictures she had been shown. Mrs. Martin told him about the pornographic images. The director apologized and Mrs. Martin immediately left.

43. The Class was one of the longest and most uncomfortable hours of Mrs. Martin's life, or so she thought. As a result of the encounter with Cohen, Mrs. Martin was extremely humiliated, embarrassed and felt both violated and foolish. She left the hotel and immediately telephoned her husband and repeated the sequence of events, incredibly shaken and very upset.

44. Mr. Martin, after hearing how upset his wife was and what had occurred during filming, went to the Internet, found a picture of the Ali G character and sent it to Mrs. Martin's office. Mrs. Martin looked at the picture and told her husband that this was not the Foreign Reporter. Mr. Martin then found a photograph of the Borat character and sent it to his wife.

45. At this point, Mrs. Martin knew she had been duped and her humiliation worsened. Mrs. Martin unsuccessfully attempted to contact Schulman with the number he had provided to her when he scheduled the Class. But, the worst was yet to come.

9

46. Shortly before the *Borat* Movie was released, one of Mrs. Martin's co-workers told her that he saw her in a movie, a sneak-preview of the *Borat* Movie at a local Birmingham, Alabama theater.

47. The *Borat* Movie was released in the United States on or about November 3, 2006.

48. The *Borat* Movie carries an R-rating "for pervasive strong crude and sexual content including graphic nudity, and language" according to the Motion Pictures Association of America and the National Association of Theatre Owners. *See* http://www.mpaa.org/FlmRat_SrchResults.asp.

49. Based on information and belief, as of December 21, 2006, the *Borat* Movie has grossed more than $260,000,000 worldwide. It is currently ranked as Number 212 on the list of highest grossing movies of all time. The term "Borat" retrieves more than 30,300,000 entries on "Google" including several thousand references to Mrs. Martin.

50. Without Mrs. Martin's consent, the Defendants revised, edited, formatted and/or distributed scenes from the filming with Mrs. Martin into a segment for the *Borat* Movie as well as for use in advertising and promotion of the movie in all entertainment venues, including, but not limited to, the Internet and cable television.

51. The segment of the *Borat* Movie with Mrs. Martin includes the following:  (a) the prominent display of Mrs. Martin's name and the words "etiquette coach" immediately after a map indicating Defendant Cohen is in "Birmingham, Alabama", (b) numerous awkward and embarrassing exchanges between Mrs. Martin and Defendant Cohen and (c) the outrageous and repulsive pornographic photographs of Defendant Cohen's (purported) son.  The *Borat* Movie prominently displays these photographs.

10

52. Despite Schulman's representation to Mrs. Martin regarding his identify as "Todd Lewis" and that her Class with the Foreign Reporter was to be filmed for a documentary to be shown on Belarus Television, Defendants were not filming a documentary for the Foreign Reporter to be shown on Belarus Television, had no intention of filming a documentary for the Foreign Reporter to be shown on Belarus Television, and misrepresented as much to Mrs. Martin.

53. The Standard Consent Agreement entered into by Mrs. Martin provides for Mrs. Martin to participate in a "documentary-style film".

54. The *Borat* Movie is neither a documentary, nor a "documentary style" movie.

55. "Todd Lewis", the individual that signed the Standard Consent Agreement, does not exist.

56. Schulman's name is not "Todd Lewis." In fact, Schulman's real name "Todd Schulman" is heavily identified with the Hollywood movie industry and had already been linked with the *Borat* Movie at the time he first contacted Mrs. Martin in October of 2005.

57. Defendant Springland Films was and is a shell company at all times acting on behalf of Defendant One America Productions, Inc. Upon information and belief, Springland Films was created solely for the purpose of concealing the true identities of those involved in the production of the *Borat* Movie, including Defendant One America Productions, Inc. which, like Schulman, had already been linked with the *Borat* Movie at the time Mrs. Martin was first contacted by Schulman.

58. Cohen is not a Foreign Reporter as Defendants represented to Mrs. Martin.

59. Cohen is not from Russia and/or a former Soviet Bloc country as Defendants represented to Mrs. Martin.

11

60. Apparently, not everyone in the filming of the *Borat* Movie was manipulated and treated as underhandedly and deceptively as Mrs. Martin. Defendants selectively disclosed the design, theme, plot, purpose and intent of the scheme of the *Borat* Movie to professional actors and/or actresses.

61. Upon information and belief, professional actors and/or actresses including Cohen, Pamela Anderson and Luenell Campbell (aka Jane Sanguinetti Luenell) were given an opportunity to review the script and knowingly participated in the *Borat* Movie. They had the option of deciding whether or not to have their names, images and likenesses associated with this R-rated film. Mrs. Martin was never given that opportunity.

62. Mrs. Martin did not authorize or consent to Defendants' use of the film from her Class with Cohen in the *Borat* Movie, a crude and distasteful R-rated film.

63. Defendants concealed the true nature of their film for their own financial gain and with the intent of humiliating Mrs. Martin.

64. Irrespective of whether the *Borat* Movie is a success or a failure at the box office, Mrs. Martin's name is now tied to, and her image associated with, an R-rated movie that depicts anti-Semitism, sexism and racism and contains graphic nudity, vulgarity and images of purported child pornography. Mrs. Martin would have never agreed to be associated with such a film.

65. Mrs. Martin is a respectable, kind and gracious woman, mother and spouse. She has participated in "Friendship Force International," a non-profit organization dedicated to "building global goodwill through personal friendships." As part of Friendship Force, Mrs. Martin has hosted several people in her home from around the world.

66. As a result of her involuntary appearance in the *Borat* Movie, Mrs. Martin has been repeatedly approached by national and international media, colleagues and strangers about her role in the *Borat* Movie. She is humiliated and embarrassed about her connection to the film.

67. Most troubling for Mrs. Martin is that she was embarrassed and humiliated to try to explain to her daughter about the *Borat* Movie and her unknowing role in the film. Mrs. Martin suffers anxiety about the effect of her association with the *Borat* Movie and the impact it will have on her family, in particular her young daughter.

68. Mrs. Martin would never have signed the Standard Consent Agreement if she had been told the truth about the *Borat* Movie by Defendants. Instead, based on Defendants' fraudulent representations and inducement about Schulman's true identify, the Foreign Reporter and the documentary for Belarus Television, Mrs. Martin signed the Standard Consent Agreement. The Defendants' misrepresentations and deceit go to the heart of the Standard Consent Agreement and void any semblance of mutual assent.

## AS AND FOR A FIRST CAUSE OF ACTION
### FRAUDULENT INDUCEMENT

69. Mrs. Martin readopts and incorporates paragraphs 1 through 68 as though set forth fully herein.

70. Defendant Springland, through its authorized agent, Schulman, knowingly, intentionally, carelessly, recklessly and negligently made the following material misrepresentations of fact to Mrs. Martin with the intent to defraud:

> (A) As provided in the Standard Consent Agreement, Mrs. Martin was to appear in a "documentary-style" film;
>
> (B) Schulman's real name was "Todd Lewis";

13

(C)   Cohen was a "foreign reporter" from Russia and/or a former Soviet Bloc country;

(D)   Defendant Springland was filming a foreign reporter's travels in the United States;

(E)   Defendant Springland and Cohen were filming for a documentary to be shown on Belarus Television when Defendant Cohen returned home; and

(F)   Defendant Springland was not filming Mrs. Martin for anything like Da Ali G Show.

71. Each of these representations was a false representation of material fact made with the intent to defraud Mrs. Martin into unknowingly participating in the *Borat* Movie.

72. Defendants knew these material misrepresentations were false but made them nevertheless with the intention of injuring Mrs. Martin and benefiting themselves.

73. Defendants defrauded Mrs. Martin into signing a Standard Consent Agreement based on the representations that a "foreign reporter" was filming a documentary for Belarus Television and that Schulman's real name was "Todd Lewis". Mrs. Martin researched Belarus Television and found that it was a legitimate national television station. Instead, Defendants incorporated the film footage of Mrs. Martin and Cohen into the *Borat* Movie, an internationally distributed movie with an R-rating.

74. Mrs. Martin reasonably relied on said misrepresentations in entering into an agreement to provide an etiquette training class to the Foreign Reporter for a documentary for Belarus Television.

75. Defendants engaged in a civil conspiracy designed to exploit and defraud Mrs. Martin into appearing in the *Borat* Movie. The Defendants knowingly, recklessly and negligently

14

combined, conspired and collaborated amongst and between themselves to defraud Mrs. Martin into appearing in an R-rated movie which contains anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography. Furthermore, the Defendants knowingly, recklessly and negligently combined, conspired and collaborated amongst and between themselves to produce and distribute the *Borat* Movie to the general public.

76. As a result of Defendants' material misrepresentations and Mrs. Martin's reasonable reliance, Mrs. Martin has been directly and substantially injured in that she has been contacted by local, national and international media, she has suffered emotional distress due to, among other things, the anxiety concerning the effect her role in the movie will have on her family and her job, she has been subjected to public ridicule and humiliation and her role in an R-rated film and connection with pornographic photos of Cohen's (purported) son have damaged her reputation.

77. As a foreseeable victim of defendants' fraud, Mrs. Martin is entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

78. Defendants' actions toward Mrs. Martin were wanton, malicious, reckless and were conducted with a conscious disregard of the rights of Mrs. Martin. Accordingly, Mrs. Martin is entitled to recover from defendants, jointly and severally, an award of punitive damages in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### QUASI CONTRACT / UNJUST ENRICHMENT

79. Mrs. Martin readopts and incorporates paragraphs 1 through 78 as though set forth fully herein.

80. Not everyone who appeared in the *Borat* Movie was manipulated and treated as underhandedly and deceptively as Mrs. Martin by Defendants. Defendants disclosed the design,

theme, plot and purpose of the *Borat* Movie to various professional actors and actresses and/or actually hired professional actors and actresses for the *Borat* Movie. These professional actors and/or actresses including Cohen, Pamela Anderson and Luenell Campbell were given the opportunity to read, review and accept their role(s) in the *Borat* Movie. Such professional actors and/or actresses were provided the benefit of avoiding the shame, embarrassment and humiliation associated with unknowingly appearing in the *Borat* Movie. Upon information and belief, these actors and/or actresses were rewarded for their voluntary appearances.

81. However, with respect to Mrs. Martin, Defendants conspired to exploit and defraud her into participating in the *Borat* Movie. Mrs. Martin was not given the same opportunity to decline a role in an R-rated movie that contains anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography.

82. Mrs. Martin felt like she was doing a public service as an American to show a foreign reporter the best of American hospitality. Defendants unjustly received the benefit of avoiding the costs of hiring a cast of professional actors and actresses by preying on unknowing individuals like Mrs. Martin. Defendants, by conspiring to defraud and exploit Mrs. Martin, retained all benefits and profits of the film at least in part at Mrs. Martin's expense which, in equity and good conscience, they should not have retained.

83. Due to the foregoing, Mrs. Martin is entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

84. Mrs. Martin readopts and incorporates paragraphs 1 through 83 as though set forth fully herein.

16

85. Defendants engaged in an intentional and pre-meditated scheme to defraud Mrs. Martin into appearing in the *Borat* Movie which has now spawned much public debate and is linked to anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography.

86. As a result of Defendants' intentional acts of conspiring to defraud, exploit and take advantage of Mrs. Martin, she has suffered emotional distress which Defendants knew or should have known would result from their deliberate and outrageous scheme.

87. The Defendants disregarded any and all concern for privacy, reputation and public image at the expense of Mrs. Martin and have subsequently subjected Mrs. Martin to incredible embarrassment, humiliation and emotional distress which would have been avoided but for Defendants' deliberate scheme designed to exploit Mrs. Martin.

88. Defendants were certain, or substantially certain, and intended that such distress would result from their conduct.

89. Defendants' conduct was so extreme, repulsive and outrageous as to exceed all possible bounds of decency.

90. Mrs. Martin has suffered extreme emotional distress as a result of Defendants' conduct.

91. As a foreseeable victim of defendants' acts, Mrs. Martin is entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

92. Defendants' actions toward Mrs. Martin were wanton, malicious, reckless and were conducted with a conscious disregard of the rights of Mrs. Martin. Accordingly, Mrs. Martin is entitled to recover from defendants, jointly and severally, an award of punitive damages in an amount to be determined at trial.

17

## AS AND FOR A FOURTH CAUSE OF ACTION
### RESCISSION

93. Mrs. Martin readopts and incorporates paragraphs 1 through 92 as though set forth fully herein.

94. Defendant Springland, through its authorized agent, Schulman, knowingly, intentionally, carelessly, recklessly and negligently made the following material misrepresentations of fact to Mrs. Martin with the intent to defraud:

> (A)    As provided in the Standard Consent Agreement, Mrs. Martin was to appear in a "documentary-style" film;
>
> (B)    Schulman's real name was "Todd Lewis";
>
> (C)    Cohen was a "foreign reporter" from Russia and/or a former Soviet Bloc country;
>
> (D)    Defendant Springland was filming a foreign reporter's travels in the United States;
>
> (E)    Defendant Springland and Cohen were filming for a documentary to be shown on Belarus Television when Defendant Cohen returned home; and
>
> (F)    Defendant Springland was not filming Mrs. Martin for anything like Da Ali G Show.

95. Each of these misrepresentations of material fact was false when they were made.

96. Defendants knew these misrepresentations of material fact were false when they were made.

97. Each of these misrepresentations of material fact was made for the purpose of inducing Mrs. Martin's reliance on the misrepresentations.

18

98. Mrs. Martin rightfully relied upon the misrepresentations of material fact set forth above, believing those misrepresentations to be true.

99. As a result of Defendants' material misrepresentations and Mrs. Martin's reasonable reliance, Mrs. Martin has been directly and substantially injured in that she has been contacted by local, national and international media, she has suffered emotional distress due to, among other things, the anxiety concerning the effect her role in the movie will have on her family and her job, she has been subjected to public ridicule and humiliation and her role in an R-rated film and connection with pornographic photos of Cohen's (purported) son have damaged her reputation.

100. By virtue of defendants' fraudulent conduct, Mrs. Martin is entitled to rescission of the Standard Consent Agreement.

**WHEREFORE,** Mrs. Martin demands judgment against Defendants as follows:

1.     On the First Cause of Action, compensatory damages in an amount to be determined at trial, together with interest, plus punitive damages in an amount to be determined at trial;

2.     On the Second cause of Action, compensatory damages in an amount to be determined at trial, together with interest;

3.     On the Third Cause of Action, compensatory damages in an amount to be determined at trial, together with interest, plus punitive damages in an amount to be determined at trial;

4.     On the Fourth Cause of Action, declaring the Standard Consent Agreement rescinded and null and void;

5.    On each Cause of Action, awarding to Mrs. Martin the costs and disbursements of

this action, including her reasonable attorneys fees and granting to her such other and further

relief as this Court deems just and proper.

### JURY DEMAND

Mrs. Martin demands a trial by jury on all claims asserted herein.

Dated: New York, New York
      March 28, 2008

                                    ADAM RICHARDS LLC

                            By: _____
                                    Adam Richards (AR-2489)
                                    Attorneys for Plaintiff
                                    Kathie Martin
                                    40 Fulton Street, 7th Floor
                                    New York, New York 10038
                                    212.233.4400

20

## STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ 350 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability to the Participant, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (b) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (c) damages caused by acts of terrorism or war, (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (e) false light (such as any allegedly false or misleading portrayal of the Participant), (f) infliction of emotional distress (whether allegedly intentional or negligent), (g) trespass (to property or person), (h) breach of any alleged contract (whether the alleged contract is verbal or in writing), (i) allegedly deceptive business or trade practices, (j) copyright or trademark infringement, (k) defamation (such as any allegedly false statements made on the Film), (l) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (m) prima facie tort (such as alleged intentional harm to the Participant), (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement), (o) breach of alleged moral rights, or (p) tortious or wrongful interference with any contracts or business of the Participant, or any claim arising out of the Participant's viewing of any sexually-oriented materials or activities.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought

before, and adjudicated by, only a competent court located in the State of New York and County of New York, under the laws of the State of New York.

AGREED AND ACCEPTED:

_Kathie B. Martin_

[please sign above line and print name below]

Dated: _10-24-05_
[date to be filled in by Participant]

Springland Films

By: _[signature]_

[please sign above line and print name below]

Description: Shirt _Blue_    _Purple Suit_    Height _____    Age _____

Hair _____    Sex _F_

Other _____

Name: _KATHIE B. MARTIN_

Address: _641 CAMDEN RIDGE BIRMINGHAM, AL. 35226_

Phone Number: _205-942-3258_

Social Security Number: _____

_ETTIQUETTE COACH_

**<u>EXHIBIT B</u>**

**To the Declaration of Slade R. Metcalf**
**in Support of Defendants' Motion To Dismiss the First Amended Complaint**

## STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ 350 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability to the Participant, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (b) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (c) damages caused by acts of terrorism or war, (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (e) false light (such as any allegedly false or misleading portrayal of the Participant), (f) infliction of emotional distress (whether allegedly intentional or negligent), (g) trespass (to property or person), (h) breach of any alleged contract (whether the alleged contract is verbal or in writing), (i) allegedly deceptive business or trade practices, (j) copyright or trademark infringement, (k) defamation (such as any allegedly false statements made on the Film), (l) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (m) prima facie tort (such as alleged intentional harm to the Participant), (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement), (o) breach of alleged moral rights, or (p) tortious or wrongful interference with any contracts or business of the Participant, or any claim arising out of the Participant's viewing of any sexually-oriented materials or activities.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought

before, and adjudicated by, only a competent court located in the State of New York and County of New York, under the laws of the State of New York.

AGREED AND ACCEPTED:

*Kathie B. Martin*

[please sign above line and print name below]

Dated: 10-24-05
[date to be filled in by Participant]

Springland Films

By: *Jeff*

[please sign above line and print name below]

Description: Shirt *Purple Suit*  *Blue*     Height_____     Age_____

Hair_____     Sex *F*

Other_____

Name: *KATHIE B. MARTIN*

Address: *641 CAMDEN RIDGE BIRMINGHAM, AL. 35226*

Phone Number: *205-942-3258*

Social Security Number:_____

*ETTIQUETTE COACH*

**EXHIBIT C**

**To the Declaration of Slade R. Metcalf**
**in Support of Defendants' Motion To Dismiss the First Amended Complaint**

ADAM RICHARDS LLP
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@arichardslaw.com

Attorneys for Plaintiff Kathie Martin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Kathie Martin,

Plaintiff,

- against -

Dan Mazer, Anthony Hines, Larry Charles,
Peter Baynham, Monica Levinson, Jay Roach,
Todd Phillips, Everyman Pictures, Twentieth
Century Fox Film Corporation, One America
Productions, Inc., Gold/Miller Productions,
Springland Films, Dune Entertainment, LLC,
MTV Networks d/b/a Comedy Central, Dakota
North Entertainment, Inc., Four by Two
Production Company, Sacha Baron Cohen,
Todd Schulman, and John Does Nos. 1-5,

Defendants.

**Index No. 08 CV 1828 (LAP)**

**FIRST AMENDED COMPLAINT**

Plaintiff Kathie Martin ("Mrs. Martin" or "Plaintiff"), by and through her undersigned

counsel, brings this First Amended Complaint against defendants Dan Mazer, Anthony Hines,

Larry Charles, Peter Baynham, Monica Levinson, Todd Phillips, Jay Roach, Sacha Baron Cohen,

Twentieth Century Fox Film Corporation, One America Productions, Inc., Everyman Pictures,

Gold/Miller Productions, Springland Films, Todd Schulman, Dune Entertainment, LLC, MTV

Networks d/b/a Comedy Central, Dakota North Entertainment, Inc., Four by Two Production

Company and fictitious defendants John Does Nos. 1 through 5 (collectively "Defendants") and

alleges the following:

#### INTRODUCTION

1. This lawsuit arises from the fraudulently obtained appearance of Mrs. Martin in the recently released movie "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*" (the "*Borat* Movie") and the knowing, intentional, negligent and/or reckless acts Defendants committed against Mrs. Martin. Mrs. Martin, who owns an etiquette training business for children and adults, was victimized and later exploited by Defendants. Defendants, under false pretenses, fraudulently induced Mrs. Martin to participate in what was represented to Mrs. Martin as being a "documentary-style film" and to be filmed under the guise of conducting a dining etiquette training class for a foreign reporter filming a "documentary for Belarus Television." The *Borat* Movie carries an R-rating and contains scenes that are anti-Semitic, sexist, racist, and depict graphic nudity, vulgarity and, specific to Mrs. Martin's scenes in the *Borat* Movie, child pornography. The *Borat* Movie is a far cry from a "documentary for Belarus Television" and, without Defendants' wrongful conduct described herein, Mrs. Martin would never have associated herself with the *Borat* Movie.

2. Apparently not everyone in the film was manipulated and treated as underhandedly and deceptively as Mrs. Martin. Paid professional actresses, such as Pamela Anderson, were aware of the theme and plot of the *Borat* Movie and were allowed to make an informed decision about whether to be filmed. Mrs. Martin was not given any true information about the filming. Instead, through fraud and deceit, Defendants hijacked Mrs. Martin's name, image, likeness and goodwill and used them in an R-rated blockbuster movie without her permission. In short, Defendants' actions toward Mrs. Martin were designed to evade meaningful consent and, thereby, subject her to ridicule for the sole purpose of enriching Defendants at her expense. Mrs. Martin neither would have agreed to appear in such a distasteful film nor participate in the massive public debate spawned by the *Borat* Movie.

2

**PARTIES**

3. Mrs. Martin is an individual residing in Jefferson County, Alabama.

4. Defendant Dan Mazer, upon information and belief, is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie.

5. Defendant Anthony Hines, upon information and belief, is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie.

6. Defendant Larry Charles, upon information and belief, is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie. Upon information and belief, Mr. Charles was the director of the *Borat* Movie and was present during the filming of the scenes involving Mrs. Martin.

7. Defendant Monica Levinson, upon information and belief, is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie.

8. Defendant Jay Roach, upon information and belief, is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie.

9. Defendant Todd Phillips upon information and belief, is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie.

10. Defendant Sacha Baron Cohen ("Cohen") is a resident of a state other than New York and participated in the filming, production and/or distribution of the *Borat* Movie.

11. Defendant Twentieth Century Fox Film Corporation ("Defendant Twentieth Century Fox") is a Delaware corporation with its principal place of business in Los Angeles County, California and filmed, produced and distributed the *Borat* Movie.

3

12. Defendant One America Productions, Inc. ("Defendant One America") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

13. Defendant Everyman Pictures ("Defendant Everyman") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

14. Defendant Gold/Miller Productions ("Defendant Gold/Miller") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

15. Defendant Springland Films ("Defendant Springland") is a California corporation with its principal place of business in Los Angeles County, California that participated in the filming, production and/or distribution of the *Borat* Movie.

16. Defendant Todd Schulman ("Schulman"), upon information and belief, resides in Los Angeles County, California and participated in the filming, production and/or distribution of the *Borat* Movie.

17. Defendant Dune Entertainment, LLC ("Defendant Dune") is a Delaware corporation with its principal place of business in Suffolk County, New York that participated in the filming, production and/or distribution of the *Borat* Movie.

18. Defendant MTV Networks d/b/a Comedy Central ("Defendant Comedy Central") is a Delaware corporation that provides television programming and that participated in the filming, production and/or distribution of the *Borat* Movie.

19. Defendant Dakota North Entertainment, Inc. ("Defendant Dakota North") is an out of state entity responsible for and/or involved with "*Reel Comedy: Borat Special*", a show airing on

4

Defendant Comedy Central that participated in the filming, production and/or distribution of the *Borat* Movie.

20. Defendant Four by Two Production Company ("Defendant Four by Two") is a California corporation that participated in the filming, production and/or distribution of the *Borat* Movie.

21. Fictitious Party Defendants John Does 1 through 5, whether singular or plural, are those individuals, corporations or other entities who, alone or in concert with others, operated to plan, commit or otherwise facilitate the conduct and/or practices that is the subject of this Complaint, and whose identities are presently unknown but will be added when their identities can be ascertained.

## JURISDICTION AND VENUE

22. Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants Monica Levinson, Twentieth Century Fox Film Corporation, One America Productions and Todd Schulman removed this action to this court from the Supreme Court of the State of New York, County of New York.

23. This Court has jurisdiction over the action pursuant to 28 U.S.C §1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b), because under the terms of a "standard consent agreement" which Mrs. Martin was fraudulently induced to enter into with Defendant One America Productions, any claim brought in connection with the *Borat* Movie must be "brought before and adjudicated by only a competent court located in the State of New York and County of New York."

5

## FACTUAL BACKGROUND

26. Mrs. Martin owns and operates The Etiquette School of Birmingham in Birmingham, Alabama. The focus of her business is etiquette training for children and adults, including corporate groups.

27. Mrs. Martin also is employed by Alabama Public Television, a non-commercial television station designed to "motivate children to learn, empower students and teachers to succeed, and provide a lifelong path to knowledge" and "committed to the values of honesty, fairness, civility and ethics in [their] programming and [their] everyday interaction with viewers, volunteers, co-workers, funding partners, and the community at large." *See* Alabama Public Television Website *available at* http://www.aptv.org/Inside/mission.asp.

28. In or about October 2005, Schulman telephoned Mrs. Martin and identified himself as "Todd Lewis". Schulman told Mrs. Martin that he had located the Etiquette School of Birmingham on the Internet and asked about the type of etiquette training she offered. Among other classes, Mrs. Martin told Schulman that she offered dining etiquette training.

29. Schulman told Mrs. Martin that he worked for Defendant Springland and that they were assisting a reporter from a former Soviet Bloc country ("Foreign Reporter"). The Foreign Reporter's name was not provided.

30. Schulman told Mrs. Martin that Defendant Springland was filming the Foreign Reporter's travels and experiences in the United States for a documentary to be created for and shown on Belarus Television.

31. Schulman then came to Mrs. Martin's home in Birmingham, Alabama, where he repeated the story about the Foreign Reporter and videotaped Mrs. Martin.

6

32. Schulman scheduled a dining etiquette training class ("Class") with Mrs. Martin for the Foreign Reporter that was to be conducted at her home on or about October 23, 2005. A fee of $300 was agreed upon to cover the cost of the Class.

33. In preparation for the Class, Mrs. Martin spent several hours researching Russian customs and culture as well as Belarus Television. Mrs. Martin did not want to do or say anything to offend the Foreign Reporter.

34. On the day of the Class, Mrs. Martin prepared a meal at her home, set her table and arranged for her husband to serve the meal during the Class with the Foreign Reporter. Schulman was the first to arrive at Mrs. Martin's home before the Class. While they were waiting for the film crew to arrive, Mrs. Martin and her husband, Mr. Ray Martin, talked with Schulman about Defendant Springland.

35. In the course of conversation, Schulman attributed the Da Ali G Show[1] to Defendant Springland. Mr. Martin had some vague knowledge of the Ali G character but Schulman assured the Martins that the segment Defendant Springland was filming with Mrs. Martin would not be anything like the Da Ali G Show. The Martins did not have any familiarity with Defendant Cohen or the Borat character portrayed by Defendant Cohen on the Da Ali G Show.

36. Following this assurance, Schulman excused himself and stepped outside of the Martin's home. He told the Martins that it was his sister's birthday and he needed to wish her a happy birthday.

37. Meanwhile, the camera crew and director arrived to set up for filming at Mrs. Martin's home. Schulman came back inside and said that the director wanted Mr. Martin and Mrs. Martin's young daughter to go outside before the Foreign Reporter arrived and during the

---

[1] Unbeknownst to the Martins at the time, the Da Ali G Show regularly appears on HBO and consists of various characters portrayed by Cohen (including a character known as Borat) who prey on unsuspecting guests.

7

filming. Mrs. Martin assumed that the director thought her daughter might interfere with the filming in some way. Mrs. Martin explained to Schulman that Mr. Martin needed to remain inside to serve the food for the Class. Mrs. Martin assured Schulman that her daughter would stay upstairs in her room and not interfere with the filming.

38. After some discussion between Schulman and the director, Schulman approached Mrs. Martin and said that they were having trouble with the time code on one of the cameras. Schulman told Mrs. Martin that another camera was on its way, but that it would not arrive in time to conduct and film the Class that day. Schulman requested that they reschedule the Class for the following day. Upon information and belief, Defendants staged the need to re-schedule in order to ensure that Mr. Martin would not be present for filming for fear that he may recognize the similarity between the Foreign Reporter and the characters portrayed by Cohen on the Da Ali G Show. Defendants were successful; given the re-scheduling from Sunday to Monday, Mr. Martin was unable to attend the make-up Class and filming.

39. The Class was rescheduled for the following day, October 24, 2005, at the Tutwiler Hotel in Birmingham, Alabama. Shortly after Mrs. Martin arrived at the Tutwiler Hotel, Schulman handed Mrs. Martin a Standard Consent Agreement. Schulman said it was a standard filming release form. Based upon Schulman's previous representations concerning, among other things, his identify as "Todd Lewis", the Foreign Reporter, the nature of the Class and filming and the intended audience, Mrs. Martin signed the form and requested a copy. *See* Exhibit A.

40. Schulman gave Mrs. Martin $350.00. Mrs. Martin and Defendant Schulman had previously agreed on a $300.00 fee for the Class and Schulman gave her an additional $50.00 for the cost of the meal she had prepared at her home the day before.

8

41. Schulman took Mrs. Martin to the filming area where she was introduced (for the first time) to the Foreign Reporter (in reality, Cohen), and Defendant Springland began filming for what Mrs. Martin had been told was a documentary for broadcast on Belarus Television.

42. During the Class, Mrs. Martin was highly offended by Cohen but she attempted to be respectful. For example, Cohen suggested to Mrs. Martin that "now is the time that we have sexual intercourse." Stunned and shaken, Mrs. Martin politely declined and attempted to direct the conversation back to the subject of the Class – dining etiquette. Mrs. Martin attributed the comment to the Foreign Reporter's extreme cultural ignorance.

43. Cohen did not stop there. Instead, he continued to make highly offensive sexist comments and insults directed at people of the Jewish faith. The latter subject was particularly upsetting to Mrs. Martin given the very recent death of one of her close friends who was of the Jewish faith. Undaunted, Cohen repeatedly attempted to bait Mrs. Martin into agreeing with his derogatory comments.

44. Although Mrs. Martin was truly repulsed by the Foreign Reporter, she attempted to calmly explain to Cohen the offensive nature of such comments and behavior in America and bring the Class to a close.

45. The situation only got worse. Cohen showed Mrs. Martin pictures of what he represented to be his family. She was shocked and embarrassed to be shown a series of pornographic pictures by Cohen of his son, who she remembers him saying was fifteen (15) years old. The pictures of Cohen's son depicted a boy exposed from the waist down and focused on the child's penis.

46. Cohen boasted about his son "being strong," an obvious reference to the penis. One of the pictures showed Cohen's head very close to the penis with a "thumbs up" sign.

47. Mrs. Martin was terribly upset and shaken by the outrageous behavior of Cohen yet she tried to remain calm and not offend the "Foreign Reporter."

48. After the filming was over, and obviously recognizing how shaken she was, the director asked Mrs. Martin what was in the pictures she had been shown. Mrs. Martin told him about the pornographic images. The director apologized and Mrs. Martin immediately left.

49. The Class was one of the longest and most uncomfortable hours of Mrs. Martin's life, or so she thought. As a result of the encounter with Cohen, Mrs. Martin was extremely humiliated, embarrassed and felt both violated and foolish. She left the hotel and immediately telephoned her husband and repeated the sequence of events, incredibly shaken and very upset.

50. Mr. Martin, after hearing how upset his wife was and what had occurred during filming, went to the Internet, found a picture of the Ali G character and sent it to Mrs. Martin's office. Mrs. Martin looked at the picture and told her husband that this was not the Foreign Reporter. Mr. Martin then found a photograph of the Borat character and sent it to his wife.

51. At this point, Mrs. Martin knew she had been duped and her humiliation worsened. Mrs. Martin unsuccessfully attempted to contact Schulman with the number he had provided to her when he scheduled the Class. But, the worst was yet to come.

52. Shortly before the *Borat* Movie was released, one of Mrs. Martin's co-workers told her that he saw her in a movie, a sneak-preview of the *Borat* Movie at a local Birmingham, Alabama theater.

53. The *Borat* Movie was released in the United States on or about November 3, 2006.

54. The *Borat* Movie carries an R-rating "for pervasive strong crude and sexual content including graphic nudity, and language" according to the Motion Pictures Association of

America and the National Association of Theatre Owners. *See* http://www.mpaa.org/FlmRat_SrchResults.asp.

55. Based on information and belief, as of December 21, 2006, the *Borat* Movie has grossed more than $260,000,000 worldwide. It is currently ranked as Number 212 on the list of highest grossing movies of all time. The term "Borat" retrieves more than 30,300,000 entries on "Google" including several thousand references to Mrs. Martin.

56. Without Mrs. Martin's consent, the Defendants revised, edited, formatted and/or distributed scenes from the filming with Mrs. Martin into a segment for the *Borat* Movie as well as for use in advertising and promotion of the movie in all entertainment venues, including, but not limited to, the Internet and cable television.

57. The segment of the *Borat* Movie with Mrs. Martin includes the following: (a) the prominent display of Mrs. Martin's name and the words "etiquette coach" immediately after a map indicating Defendant Cohen is in "Birmingham, Alabama", (b) numerous awkward and embarrassing exchanges between Mrs. Martin and Defendant Cohen and (c) the outrageous and repulsive pornographic photographs of Defendant Cohen's (purported) son. The *Borat* Movie prominently displays these photographs.

58. Despite Schulman's representation to Mrs. Martin regarding his identify as "Todd Lewis" and that her Class with the Foreign Reporter was to be filmed for a documentary to be shown on Belarus Television, Defendants were not filming a documentary for the Foreign Reporter to be shown on Belarus Television, had no intention of filming a documentary for the Foreign Reporter to be shown on Belarus Television, and misrepresented as much to Mrs. Martin.

59. The Standard Consent Agreement entered into by Mrs. Martin provides for Mrs. Martin to participate in a "documentary-style film".

60. The *Borat* Movie is neither a documentary, nor a "documentary style" movie.

61. "Todd Lewis", the individual that signed the Standard Consent Agreement, does not exist.

62. Schulman's name is not "Todd Lewis." In fact, Schulman's real name "Todd Schulman" is heavily identified with the Hollywood movie industry and had already been linked with the *Borat* Movie at the time he first contacted Mrs. Martin in October of 2005.

63. Defendant Springland Films was and is a shell company at all times acting on behalf of Defendant One America Productions, Inc. Upon information and belief, Springland Films was created solely for the purpose of concealing the true identities of those involved in the production of the *Borat* Movie, including Defendant One America Productions, Inc. which, like Schulman, had already been linked with the *Borat* Movie at the time Mrs. Martin was first contacted by Schulman.

64. Cohen is not a Foreign Reporter as Defendants represented to Mrs. Martin.

65. Cohen is not from Russia and/or a former Soviet Bloc country as Defendants represented to Mrs. Martin.

66. Apparently, not everyone in the filming of the *Borat* Movie was manipulated and treated as underhandedly and deceptively as Mrs. Martin. Defendants selectively disclosed the design, theme, plot, purpose and intent of the scheme of the *Borat* Movie to professional actors and/or actresses.

67. Upon information and belief, professional actors and/or actresses including Cohen, Pamela Anderson and Luenell Campbell (aka Jane Sanguinetti Luenell) were given an opportunity to review the script and knowingly participated in the *Borat* Movie. They had the

12

option of deciding whether or not to have their names, images and likenesses associated with this R-rated film. Mrs. Martin was never given that opportunity.

68. Mrs. Martin did not authorize or consent to Defendants' use of the film from her Class with Cohen in the *Borat* Movie, a crude and distasteful R-rated film.

69. Defendants concealed the true nature of their film for their own financial gain and with the intent of humiliating Mrs. Martin.

70. Irrespective of whether the *Borat* Movie is a success or a failure at the box office, Mrs. Martin's name is now tied to, and her image associated with, an R-rated movie that depicts anti-Semitism, sexism and racism and contains graphic nudity, vulgarity and images of purported child pornography. Mrs. Martin would have never agreed to be associated with such a film.

71. Mrs. Martin is a respectable, kind and gracious woman, mother and spouse. She has participated in "Friendship Force International," a non-profit organization dedicated to "building global goodwill through personal friendships." As part of Friendship Force, Mrs. Martin has hosted several people in her home from around the world.

72. As a result of her involuntary appearance in the *Borat* Movie, Mrs. Martin has been repeatedly approached by national and international media, colleagues and strangers about her role in the *Borat* Movie. She is humiliated and embarrassed about her connection to the film.

73. Most troubling for Mrs. Martin is that she was embarrassed and humiliated to try to explain to her daughter about the *Borat* Movie and her unknowing role in the film. Mrs. Martin suffers anxiety about the effect of her association with the *Borat* Movie and the impact it will have on her family, in particular her young daughter.

74. Mrs. Martin would never have signed the Standard Consent Agreement if she had been told the truth about the *Borat* Movie by Defendants. Instead, based on Defendants' fraudulent

13

representations and inducement about Schulman's true identify, the Foreign Reporter and the documentary for Belarus Television, Mrs. Martin signed the Standard Consent Agreement. The Defendants' misrepresentations and deceit go to the heart of the Standard Consent Agreement and void any semblance of mutual assent.

## AS AND FOR A FIRST CAUSE OF ACTION
### FRAUDULENT INDUCEMENT

75. Mrs. Martin readopts and incorporates paragraphs 1 through 74 as though set forth fully herein.

76. Defendant Springland, through its authorized agent, Schulman, knowingly, intentionally, carelessly, recklessly and negligently made the following material misrepresentations of fact to Mrs. Martin with the intent to defraud:

> (A) As provided in the Standard Consent Agreement, Mrs. Martin was to appear in a "documentary-style" film;
>
> (B) Schulman's real name was "Todd Lewis";
>
> (C) Cohen was a "foreign reporter" from Russia and/or a former Soviet Bloc country;
>
> (D) Defendant Springland was filming a foreign reporter's travels in the United States;
>
> (E) Defendant Springland and Cohen were filming for a documentary to be shown on Belarus Television when Defendant Cohen returned home; and
>
> (F) Defendant Springland was not filming Mrs. Martin for anything like Da Ali G Show.

77. Each of these representations was a false representation of material fact made with the intent to defraud Mrs. Martin into unknowingly participating in the *Borat* Movie.

14

78. Defendants knew these material misrepresentations were false but made them nevertheless with the intention of injuring Mrs. Martin and benefiting themselves.

79. Defendants defrauded Mrs. Martin into signing a Standard Consent Agreement based on the representations that a "foreign reporter" was filming a documentary for Belarus Television and that Schulman's real name was "Todd Lewis". Mrs. Martin researched Belarus Television and found that it was a legitimate national television station. Instead, Defendants incorporated the film footage of Mrs. Martin and Cohen into the *Borat* Movie, an internationally distributed movie with an R-rating.

80. Mrs. Martin reasonably relied on said misrepresentations in entering into an agreement to provide an etiquette training class to the Foreign Reporter for a documentary for Belarus Television.

81. Defendants engaged in a civil conspiracy designed to exploit and defraud Mrs. Martin into appearing in the *Borat* Movie. The Defendants knowingly, recklessly and negligently combined, conspired and collaborated amongst and between themselves to defraud Mrs. Martin into appearing in an R-rated movie which contains anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography. Furthermore, the Defendants knowingly, recklessly and negligently combined, conspired and collaborated amongst and between themselves to produce and distribute the *Borat* Movie to the general public.

82. As a result of Defendants' material misrepresentations and Mrs. Martin's reasonable reliance, Mrs. Martin has been directly and substantially injured in that she has been contacted by local, national and international media, she has suffered emotional distress due to, among other things, the anxiety concerning the effect her role in the movie will have on her family and her job, she has been subjected to public ridicule and humiliation and her role in an R-rated film

15

and connection with pornographic photos of Cohen's (purported) son have damaged her reputation.

83. As a foreseeable victim of defendants' fraud, Mrs. Martin is entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

84. Defendants' actions toward Mrs. Martin were wanton, malicious, reckless and were conducted with a conscious disregard of the rights of Mrs. Martin. Accordingly, Mrs. Martin is entitled to recover from defendants, jointly and severally, an award of punitive damages in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### QUASI CONTRACT / UNJUST ENRICHMENT

85. Mrs. Martin readopts and incorporates paragraphs 1 through 84 as though set forth fully herein.

86. Not everyone who appeared in the *Borat* Movie was manipulated and treated as underhandedly and deceptively as Mrs. Martin by Defendants. Defendants disclosed the design, theme, plot and purpose of the *Borat* Movie to various professional actors and actresses and/or actually hired professional actors and actresses for the *Borat* Movie. These professional actors and/or actresses including Cohen, Pamela Anderson and Luenell Campbell were given the opportunity to read, review and accept their role(s) in the *Borat* Movie. Such professional actors and/or actresses were provided the benefit of avoiding the shame, embarrassment and humiliation associated with unknowingly appearing in the *Borat* Movie. Upon information and belief, these actors and/or actresses were rewarded for their voluntary appearances.

87. However, with respect to Mrs. Martin, Defendants conspired to exploit and defraud her into participating in the *Borat* Movie. Mrs. Martin was not given the same opportunity to

16

decline a role in an R-rated movie that contains anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography.

88. Mrs. Martin felt like she was doing a public service as an American to show a foreign reporter the best of American hospitality. Defendants unjustly received the benefit of avoiding the costs of hiring a cast of professional actors and actresses by preying on unknowing individuals like Mrs. Martin. Defendants, by conspiring to defraud and exploit Mrs. Martin, retained all benefits and profits of the film at least in part at Mrs. Martin's expense which, in equity and good conscience, they should not have retained.

89. Due to the foregoing, Mrs. Martin is entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

90. Mrs. Martin readopts and incorporates paragraphs 1 through 89 as though set forth fully herein.

92. Defendants engaged in an intentional and pre-meditated scheme to defraud Mrs. Martin into appearing in the *Borat* Movie which has now spawned much public debate and is linked to anti-Semitism, sexism, racism, vulgarity, graphic nudity and child pornography.

93. As a result of Defendants' intentional acts of conspiring to defraud, exploit and take advantage of Mrs. Martin, she has suffered emotional distress which Defendants knew or should have known would result from their deliberate and outrageous scheme.

94. The Defendants disregarded any and all concern for privacy, reputation and public image at the expense of Mrs. Martin and have subsequently subjected Mrs. Martin to incredible embarrassment, humiliation and emotional distress which would have been avoided but for Defendants' deliberate scheme designed to exploit Mrs. Martin.

17

95. Defendants were certain, or substantially certain, and intended that such distress would result from their conduct.

96. Defendants' conduct was so extreme, repulsive and outrageous as to exceed all possible bounds of decency.

97. Mrs. Martin has suffered extreme emotional distress as a result of Defendants' conduct.

98. As a foreseeable victim of defendants' acts, Mrs. Martin is entitled to recover from defendants, jointly and severally, compensatory damages in an amount to be determined at trial.

99. Defendants' actions toward Mrs. Martin were wanton, malicious, reckless and were conducted with a conscious disregard of the rights of Mrs. Martin. Accordingly, Mrs. Martin is entitled to recover from defendants, jointly and severally, an award of punitive damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### RESCISSION

100. Mrs. Martin readopts and incorporates paragraphs 1 through 99 as though set forth fully herein.

101. Defendant Springland, through its authorized agent, Schulman, knowingly, intentionally, carelessly, recklessly and negligently made the following material misrepresentations of fact to Mrs. Martin with the intent to defraud:

> (A) As provided in the Standard Consent Agreement, Mrs. Martin was to appear in a "documentary-style" film;
>
> (B) Schulman's real name was "Todd Lewis";
>
> (C) Cohen was a "foreign reporter" from Russia and/or a former Soviet Bloc country;

18

(D)     Defendant Springland was filming a foreign reporter's travels in the United States;

(E)     Defendant Springland and Cohen were filming for a documentary to be shown on Belarus Television when Defendant Cohen returned home; and

(F)     Defendant Springland was not filming Mrs. Martin for anything like Da Ali G Show.

102. Each of these misrepresentations of material fact was false when they were made.

103. Defendants knew these misrepresentations of material fact were false when they were made.

104. Each of these misrepresentations of material fact was made for the purpose of inducing Mrs. Martin's reliance on the misrepresentations.

105. Mrs. Martin rightfully relied upon the misrepresentations of material fact set forth above, believing those misrepresentations to be true.

106. As a result of Defendants' material misrepresentations and Mrs. Martin's reasonable reliance, Mrs. Martin has been directly and substantially injured in that she has been contacted by local, national and international media, she has suffered emotional distress due to, among other things, the anxiety concerning the effect her role in the movie will have on her family and her job, she has been subjected to public ridicule and humiliation and her role in an R-rated film and connection with pornographic photos of Cohen's (purported) son have damaged her reputation.

107. By virtue of Defendants' fraudulent conduct, Mrs. Martin is entitled to rescission of the Standard Consent Agreement.

**WHEREFORE,** Mrs. Martin demands judgment against Defendants as follows:

19

1.   On the First Cause of Action, compensatory damages in an amount to be determined at trial, together with interest, plus punitive damages in an amount to be determined at trial;

2.   On the Second cause of Action, compensatory damages in an amount to be determined at trial, together with interest;

3.   On the Third Cause of Action, compensatory damages in an amount to be determined at trial, together with interest, plus punitive damages in an amount to be determined at trial;

4.   On the Fourth Cause of Action, declaring the Standard Consent Agreement rescinded and null and void;

5.   On each Cause of Action, awarding to Mrs. Martin the costs and disbursements of this action, including her reasonable attorneys fees and granting to her such other and further relief as this Court deems just and proper.

### JURY DEMAND

Mrs. Martin demands a trial by jury on all claims asserted herein.

Dated: New York, New York
April 10, 2008

ADAM RICHARDS LLC

By:

Adam Richards (AR-2489)
Attorneys for Plaintiff Kathie Martin
40 Fulton Street, 7th Floor
New York, New York 10038
212.233.4400

20

ADAM RICHARDS LLP
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@arichardslaw.com

Attorneys for Plaintiff Kathie Martin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Kathie Martin,

                              Plaintiff,

        - against -

Dan Mazer, Anthony Hines, Larry Charles,
Peter Baynham, Monica Levinson, Jay Roach,          **Index No. 08 CV 1828 (LAP)**
Todd Phillips, Everyman Pictures, Twentieth
Century Fox Film Corporation, One America            **AFFIDAVIT OF SERVICE**
Productions, Inc., Gold/Miller Productions,
Springland Films, Dune Entertainment, LLC,
MTV Networks d/b/a Comedy Central, Dakota
North Entertainment, Inc., Four by Two
Production Company, Sacha Baron Cohen,
Todd Schulman, and John Does Nos. 1-5,

                              Defendants.

STATE OF NEW YORK     )
                                        ss.:
COUNTY OF NEW YORK )

        Adam Richards, being duly sworn, deposes and says:

        I am over eighteen years of age, am not a party to this action and reside in New

York, New York.

        On April 11, 2008, I served the within **First Amended Complaint** via DHL

Express overnight mail, addressed to the following person at the address set forth after

the name:

Slade R. Metcalf, Esq.
Hogan & Hartson LLP
Attorneys for Defendants Monica Levinson, Jay Roach, Todd Phillips, Everyman
Pictures, Twentieth Century Fox Film Corporation, One America Productions, Inc.,
Springland Films, Dune Entertainment, LLC, MTV Networks d/b/a Comedy Central,
Dakota North Entertainment, Inc., Four by Two Production Company, Sacha Baron
Cohen and Todd Schulman,
875 Third Avenue
New York, New York 10022

_____

Adam Richards

Sworn to before me on this
11th day of April, 2008

_____

Notary Public

**Amber Alvarado**
**Notary Public State Of New York**
**No. 01AL6149425**
**Qualified In Kings County**
**Commission Expires July 10, 2010**

2

**<u>EXHIBIT D</u>**

**To the Declaration of Slade R. Metcalf
in Support of Defendants' Motion To Dismiss the First Amended Complaint**

Courtesy Copy

Slade R. Metcalf (SM 8360)
Katherine M. Bolger (KB 6206)
Rachel F. Strom (RS 9666)
Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
*Attorneys for Defendants Monica Levinson,*
*Twentieth Century Fox Film Corporation,*
*One America Productions, Inc., Todd Schulman,*
*Sacha Baron Cohen, Larry Charles, Jay Roach*
*Everyman Pictures, Springland Films, Dune*
*Entertainment, LLC, MTV Networks d/b/a*
*Comedy Central, Dakota North Entertainment,*
*Inc., and Four by Two Production Company*



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/23/08

RECEIVED

APR 2 2 2008

LORETTA A. PRESKA
U. S. DISTRICT JUDGE
S. D. N. Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

Kathie Martin,

                Plaintiff,

              against –

Dan Mazer, Anthony Hines, Larry Charles,
Peter Baynham, Monica Levinson, Jay
Roach, Todd Phillips, Everyman Pictures,
Twentieth Century Fox Film Corporation,
One America Productions, Inc., Gold/Miller
Productions, Springland Films, Dune
Entertainment, LLC, MTV Networks d/b/a
Comedy Central, Dakota North
Entertainment, Inc., Four by Two
Production Company, Sacha Baron Cohen,
Todd Schulman, and John Does Nos. 1-5,

                Defendants.

----------------------------------------------------------------X

Case No. 08 CV 1828 (LAP)

**STIPULATION
AND ORDER**

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned

counsel for the Plaintiff and defendants Monica Levinson, Twentieth Century Fox Film

Corporation, One America Productions, Inc. and Todd Schulman (collectively the "Removing

Defendants") and defendants Sacha Baron Cohen, Larry Charles, Jay Roach, Everyman Pictures,

\\NY - 711910/000005 - 998011 v1

Springland Films, Dune Entertainment LLC, MTV Networks d/b/a Comedy Central, Dakota North Entertainment, Inc., and Four by Two Production Company (collectively along with the Removing Defendants, the "Served Defendants");

1.  On October 22, 2007, Plaintiff filed a Summons With Notice in the Supreme Court of the State of New York, County of New York;

2.  On February 22, 2008, the Removing Defendants removed the above-captioned action to the United States District Court for the Southern District of New York;

3.  Counsel for the Removing Defendants accepted service of the Summons With Notice on behalf of Defendants Sacha Baron Cohen, Larry Charles, Jay Roach, Everyman Pictures, Springland Films, Dune Entertainment LLC, MTV Networks d/b/a Comedy Central, Dakota North Entertainment, Inc., and Four by Two Production Company;

3.  On or about March 12, 2008, Plaintiff and the Served Defendants stipulated that Plaintiff would serve a Complaint upon the Served Defendants by March 28, 2008 and the Served Defendants would respond to the Complaint by April 21, 2008 (the "First Stipulation");

4.  On March 19, 2008, this Court so ordered the First Stipulation;

5.  On March 28, 2008, Plaintiff and the Served Defendants stipulated that Plaintiff would serve a Complaint upon the Served Defendants by March 28, 2008 and the Served Defendants would respond to the Complaint by April 28, 2008 (the "Second Stipulation");

6.  On March 28, 2008, Plaintiff filed a Complaint in this Court;

7.  On April 2, 2008, this Court so ordered the Second Stipulation;

8.  On April 11, 2008, Plaintiff filed a First Amended Complaint in this Court;

9. The parties hereby agree that the Served Defendants time to answer, move or otherwise respond to the First Amended Complaint be and the same hereby is extended to and including May 5, 2008;

10. No other extensions of time have been requested or granted in this matter regarding the Served Defendants' time to respond to the Amended Complaint;

11. A facsimile copy of the signature page of this stipulation will be deemed to be an original for purposes of filing and judicial endorsement.

Dated: _____

Adam Richards
ADAM RICHARDS LLC
40 Fulton Street
7th Floor
New York, New York 10038
Tel: (212) 233-4400
*Attorneys for Plaintiff*
*Kathie Martin*

Dated: April 21, 2008

Slade R. Metcalf (SM 8360)
Katherine M. Bolger (KB 6206)
Rachel F. Strom (RS 9666)
HOGAN & HARTSON LLP
875 Third Avenue
New York, NY 10022
Tel: (212) 918-3000
*Attorneys for Defendants Monica Levinson,*
*Twentieth Century Fox Film Corporation,*
*One America Productions, Inc., Todd*
*Schulman, Sacha Baron Cohen, Larry*
*Charles, Jay Roach Everyman Pictures,*
*Springland Films, Dune Entertainment,*
*LLC, MTV Networks d/b/a Comedy Central,*
*Dakota North Entertainment, Inc., and Four*
*by Two Production Company*

IT IS SO ORDERED:

Loretta A. Preska
U.S.D.J.

Dated: April 23, 2008

3