ADAM RICHARDS LLP
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@arichardslaw.com

Attorneys for Plaintiff Kathie Martin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Kathie Martin,

                    Plaintiff,

          - against -

Dan Mazer, Anthony Hines, Larry Charles,
Peter Baynham, Monica Levinson, Jay Roach,       **Index No. 08 CV 1828 (LAP)**
Todd Phillips, Everyman Pictures, Twentieth
Century Fox Film Corporation, One America
Productions, Inc., Gold/Miller Productions,
Springland Films, Dune Entertainment, LLC,
MTV Networks d/b/a Comedy Central, Dakota
North Entertainment, Inc., Four by Two
Production Company, Sacha Baron Cohen,
Todd Schulman, and John Does Nos. 1-5,

                    Defendants.

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDNATS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

Table of Authorities ...................................................................................................ii

Preliminary Statement................................................................................................ 1

Argument ................................................................................................................... 3

I.     BECAUSE MRS. MARTIN ALLEGES THAT THE RELEASE WAS
       PROCURED BY FRAUD, THE MOTION TO DISMISS SHOULD
       BE DENIED AS A MATTER OF LAW ............................................................ 3

II.    MRS. MARTIN STATES A CLAIM FOR FRAUD ............................................. 5

       A.   The Release Is Deliberately Misleading, is Unenforceable And
            Does Not Contradict the Claims Of Fraud In The Complaint ....................... 7

       B.   Even If The Term "Documentary-Style Film" Is Not Found To
            Be Misleading, It Is An Ambiguity Which Cannot Be Resolved
            On Defendants Motion As A Matter Of Law ............................................... 10

       C.   The Merger Clause And Disclaimers In The Release Do Not
            Bar Plaintiff's Claims .................................................................................. 12

III.   PLAINTIFF STATES A VALID CLAIM FOR UNJUST
       ENRICHMENT................................................................................................ 16

IV.    PLAINTIFF HAS STATED A CLAIM FOR INTENTIONAL
       INFLICTION OF EMOTIONAL DISTRESS ..................................................... 19

Conclusion ............................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

Anger v. Ford Motor Co. Dealer Development, 80 A.D.2d 736,
    437 N.Y.S.2d 165 (4th Dep't 1981) ........................................................................ 4

Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank,
    819 F.Supp. 1282 (S.D.N.Y. 1993)........................................................................ 12

Bloss v. Va'ad Harabonim of Riverdale, 203 A.D.2d 36, 610 N.Y.S.2d 197
    (1st Dep't 1994) .................................................................................................. 4, 15

Cahill v. Regan, 5 N.Y.2d 292, 184 N.Y.S.2d 348 (1959) ................................................ 7

Cleangen Corp. v. Filmax Corp., 3 A.D.3d 468, 772 N.Y.S.2d 692
    (2d Dep't 2004).................................................................................................... 16

Comi v. Breslin & Breslin, 257 A.D.2d 754, 683 N.Y.S.2d 345
    (3rd Dep't 1999)................................................................................................... 15

Demaria v. Brenhouse, 277 A.D.2d 344, 716 N.Y.S.2d 99 (2d Dep't 2000) .................... 7

Dimon Incorporated v. Folium, Inc., 48 F.Supp.2d 359 (S.D.N.Y. 1999) ....................... 13

Doldan v. Fenner, 309 A.D.2d 1274, 765 N.Y.S. 2d 401 (4th Dep't 2003) ...................... 11

Ex parte Procom Services, Inc., 884 So.2d 827, 832 (Ala. 2003)………………………. 7

Farber v. Breslin, 47 A.D.3d 873, 850 N.Y.S.2d 604 (2d Dep't 2008) ............................. 4

Federal Deposit Ins. Corp. v. First International Bank., 1999 WL 1114692,
    No. 98 Civ. 8374 (LLS) (S.D.N.Y., Dec. 7, 1999) .............................................. 16

Gibli v. Kadosh, 279 A.D.2d 35, 717 N.Y.S.2d 553 (1st Dep't 2000).............................. 15

Golden Pacific Bancorp. v. Fed. Deposit Ins. Corp., 273 F.3d 509
    (2d Cir. 1993)................................................................................................ 10, 11

Haynes v. Garez, 304 A.D.2d 714, 758 N.Y.S.2d 391 (2d Dep't 2003) ........................... 15

Hoffenberg v. Hoffman & Pollok, 248 F.Supp.2d 303 (S.D.N.Y. 2003) ........................... 5

Information Superhighway, Inc. v. Talk America, Inc., 274 F.Supp.2d 466
    (S.D.N.Y. 2003) .................................................................................................. 11

Integrated Book Technology, Inc. v. T/R Systems, Inc., 2 A.D.3d 1193,
    770 N.Y.S.2d 186 (3rd Dep't 2003)..................................................................... 11

Joseph v. NRT Incorporated, 43 A.D. 3d 312, 841 N.Y.S.2d 38
    (1st Dep't 2007) ...................................................................................................... 16

Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Systems, Inc.,
    176 F.Supp.2d 199 (S.D.N.Y. 2001).................................................................... 3

Lemerond v. Twentieth Century Fox Film Corp., No. 07 Civ. 4635 (LAP),
    (S.D.N.Y. Mar. 31, 2008) .............................................................................. 18, 19

Lifson v. INA Life Ins. Co. of New York, 333 F.3d 349 (2d Cir. 2003)......................... 11

Louros v. Cyr, 175 F.Supp.2d 497 (S.D.N.Y. 2001) .................................................. 16, 19

Mallis v. Bankers Trust Co., 615 F.2d 68 (2d Cir. 1980) .................................................. 12

Newin Corp. v. Hartford Accident and Indemnity Co., 37 N.Y.2d 211,
    371 N.Y.S.2d 884 (1975) ................................................................................... 3, 5

Nunez v. A-T Fin. Info. Inc., 957 F.Supp. 438 (S.D.N.Y. 1997) ................................... 20

Paramount Film Distributing Corp. v. State of New York, 30 N.Y.2d 415,
    334 N.Y.S.2d 388 (1972)...................................................................................... 16

Psenicska v. Twentieth Century Fox Film Corp., et al; Case No. 07 Civ. 10972..... 7, 8, 13

Rivera v. Vickers, 72 A.D.2d 807, 421 N.Y.S.2d 918 (2d Dep't 1979)........................... 15

Ryon v. Wanamaker, Inc., 116 Misc. 91, 190 N.Y.S. 250 (Sup. Ct., N.Y. Co.
    1921), aff'd. 202 App.Div. 848, 194 N.Y.S. 977 (2d Dep't. 1922),
    aff'd. 235 N.Y. 545, 139 N.E. 728 (1923) .......................................................... 18

Solutia v. FMC Corp., 456 F.Supp.2d 429 (S.D.N.Y. 2006)........................................... 12

Starr v. Johnsen, 143 A.D.2d 130, 531 N.Y.S.2d 589 (2d Dep't 1988) ................... 14, 15

Steen v. Bump, 233 A.D.2d 583, 649 N.Y.S.2d 731 (3rd Dep't 1996) .............................. 3

Streit v. Twentieth Century Fox Film Corp., et al; Case No. 08 Civ. 01571.................... 13

Weil v. Johnson, No. 119431/02, 2002 WL 31972157
(Sup. Ct. N.Y. Co., Sept. 27, 2002) ……………………………………………………10

**Statutes**

New York Civil Rights Law §51 .............................................................................. 2, 18

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................... 1

**Other Authorities**

Gritten:  <u>Halliwell's Film Video & DVD Guide 2008</u> .................................................. 9,16

http://www.goldenglobes.org/nominations/year/2006......................................................... 8

http://www.huffingtonpost.com/2008/05/19/bruno-sacha-baron-cohen-
       t_n_102416.html ........................................................................................... 20

http://www.oscars.org/79academyawards/nomswins.html.................................................. 9

http://www.telegraph.co.uk/arts/main.jhtml?xml=/arts/2007/12/21/bfborat121.
       xml ............................................................................................................... 9

Plaintiff Kathie Martin ("Plaintiff" or "Mrs. Martin") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the First Amended Complaint**.**

### Preliminary Statement

Defendants' motion seeks to enforce a deliberately misleading release procured and executed by an individual using a false name, on behalf of a production company that did not exist.  <u>See</u> Complaint, Exh. A (the "Release").

After being told she was to give a dining etiquette course to a "foreign reporter" for a film to be shown exclusively on Belarus Public Television, Plaintiff executed the Release when it was presented to her just prior to the filming of her scene. As much of the movie-going public is now aware, Defendants were, in fact, shooting a scene for the now infamous "*Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan"* (the "Borat Movie").

In their motion, Defendants ask this Court to overlook Plaintiff's well-plead allegations that she was repeatedly lied to and defrauded into entering into the Release in question. As a threshold matter of well-established New York law, however, well-plead allegations of fraud such as those in the Complaint here are, in and of themselves, sufficient to defeat a motion to dismiss which, like the one here, is premised on a release. The motion should be denied for that reason alone.

Defendants claim that the wording of the Release contradicts any claim of fraud. They argue that the Borat Movie is exactly the "documentary-style film" that was portrayed in the Release.  This argument is not only belied by statements made to the press by Defendant Sacha Baron Cohen himself, but by film journalists, authors and the

awards the Borat Movie won, none of which, of course, were in the "documentary" category.  The Borat Movie is not a documentary.  Instead, the entire movie is premised on the Defendants' successes in fooling multiple innocent and unwitting participants like Mrs. Martin.  At the very least, the term is ambiguous and, as a matter of law, cannot be used as a basis to rule on Defendants' Rule 12(b)(6) motion.

Defendants also claim that the disclaimers in the merger provision of the Release absolve them of their wrongdoing.  That is not so.  Defendants, Hollywood "players" and "insiders" all, had peculiar knowledge of the transaction at hand, had a duty in equity and good conscience to disclose the true nature of their business with Mrs. Martin and, in failing to do so, effectively precluded Mrs. Martin from undertaking any investigation into either the terms of the Release or the misrepresentations of fact that were made to her.

Defendants do not argue that Plaintiff fails to state a claim for unjust enrichment. Rather, they argue that this claim is precluded by New York Civil Rights Law ¶51.  But Mrs. Martin has not alleged a Civil Rights Law claim. She admits that she signed the Release.   Her point is that she was defrauded into doing so and, as a result, the Defendants have enjoyed great riches.   Plaintiff seeks proper restitution, not only to adequately compensate her for her appearance in the movie (above and beyond the paltry $350.00 she was paid), but for the extreme humiliation and distress her appearance in the movie has caused.

Mrs. Martin's claim for intentional infliction of emotional distress should also stand. Mrs. Martin is now, and forever will be, identified with what the movie portrays as reactionary viewpoints typical of those from the South.   Allied with the fact that her

scene included outright vulgarity, nudity and what amounts to child pornography, Mrs.

Martin's distress is frankly unfathomable.  She is entitled to her day in court.

**Argument**

**I.    BECAUSE MRS. MARTIN ALLEGES THAT THE RELEASE WAS PROCURED BY FRAUD, THE MOTION TO DISMISS SHOULD BE DENIED AS A MATTER OF LAW.**

In their motion to dismiss, Defendants rely almost exclusively upon the Release.

Mrs. Martin claims with specificity and particularity, that she was defrauded into

executing the Release.  As set forth below, the particularized allegations of fraud in the

Complaint, all of which must be taken as true here, are more than sufficient, standing

alone, to support a denial of Defendants' motion to dismiss as a matter of well-settled

New York law.

In 1975, the Court of Appeals held that where a complaint alleges that the

execution of a release was "improperly obtained," that allegation, in and of itself, is

sufficient to support a denial of a motion to dismiss a complaint on the basis of such a

release. Newin Corp. v. Hartford Accident and Indemnity Co., 37 N.Y.2d 211, 217, 371

N.Y.S.2d 884, 889 (1975).

Since then, numerous New York Courts have followed the decision of the Court

of Appeals in Newin Corp. See, e.g., Ladenburg Thalmann & Co., Inc. v. Imaging

Diagnostic Systems, Inc., 176 F.Supp.2d 199, 205 (S.D.N.Y. 2001) ("[u]nder relevant

New York case law, mere allegations of fraud in the inducement of a release warrant

denial of a motion to dismiss that is grounded on a release"); Steen v. Bump, 233 A.D.2d

583, 584 649 N.Y.S.2d 731, 732 (3rd Dep't 1996) ("[p]laintiff's factual allegations of

fraud in the procurement of the release were sufficient to defeat defendant's … motion to

3

dismiss the complaint"); <u>Farber v. Breslin</u>, 47 A.D.3d 873, 877, 850 N.Y.S.2d 604, 608 (2d Dep't 2008) (finding that trial court erred in granting a motion to dismiss on grounds of release where "the allegations of fraud were sufficient to support a possible finding that the release signed by the plaintiff was obtained 'under circumstances which indicate unfairness') (citation omitted); <u>Bloss v. Va'ad Harabonim of Riverdale</u>, 203 A.D.2d 36, 37, 610 N.Y.S.2d 197, 198 (1st Dep't 1994) ("[w]here fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied"); <u>Anger v. Ford Motor Co. Dealer Development</u>, 80 A.D.2d 736, 736, 437 N.Y.S.2d 165, 165 (4th Dep't. 1981) (ordering an evidentiary hearing on the validity of the release after finding that the trial court erred in dismissing complaint based on release where plaintiff had alleged fraud in its procurement).

Here, of course, Mrs. Martin goes much further than the standards set by the Court of Appeals; she not only contends that her execution of the Release was improperly obtained, she alleges outright fraud.

The Complaint alleges, among other things, that Defendants, acting in concert through Defendants Schulman, Springland and One America, represented to Mrs. Martin both over the telephone and in person, that Springland Films was assisting a reporter from a former Soviet Bloc in the reporter's travels and experiences in the United States for a documentary to be created for and shown on Belarus Television.  Complaint ¶¶ 29-31.  The Complaint goes on to allege that just prior to the filming of the segment involving Mrs. Martin, Schulman provided her with a copy of the Release providing for her participation in a "documentary-style film" to be produced by Springland Films. Complaint ¶¶ 59-60.  The Complaint alleges that Defendant Schulman represented

himself to Mrs. Martin as Todd Lewis and that Schulman executed the Release as Todd Lewis. Complaint ¶¶ 61-62. Each of these representations was material to Mrs. Martin executing the Release. Complaint ¶ 79. Each of these representations was false.

The Borat character was not a reporter from a former Soviet Bloc country; the Borat Movie was not a documentary to be created for and shown on Belarus Television; Defendant Springland was a shell company created to hide the true identity of Defendant One-America, was not Schulman's employer and was not the producer of the Borat Movie, One America was; the individual "Todd Lewis" was an illusion to hide Schulman's true identity; and the Borat Movie is not a "documentary-style film."

Under the New York Court of Appeals decision in Newin Corp. and its progeny, this Court need go no further than the allegations of fraud set forth above to deny Defendants' motion.

## II.    MRS. MARTIN STATES A CLAIM FOR FRAUD

Defendants acknowledge that the terms of a release are not necessarily binding where, as here, fraudulent inducement of the Release has been alleged. Relying on Hoffenberg v. Hoffman & Pollok, 248 F. Supp. 2d 303 (S.D.N.Y. 2003), Defendants argue that in order to avoid the preclusive effects of a release due to allegations of fraudulent inducement, a party must prove: "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." 248 F. Supp. 2d at 310.

As set forth in Point I, *infra*, Plaintiff easily satisfies each of these elements. Indeed, it is telling that, of the elements set forth above, Defendants challenge only one – reliance. Defendants claim first that Mrs. Martin could not have reasonably relied upon the misrepresentations made to her because those misrepresentations were contradicted by the terms of the Release. Second, Defendants claim that Mrs. Martin specifically disclaimed reliance on any of the misrepresentations that were made. Neither argument has merit.

First, as alleged in the Complaint, in executing the Release, Mrs. Martin agreed to participate in the "documentary-style film" that had been described to her by Defendant Schulman. This term does not accurately reflect the nature of the Borat Movie and is misleading. Therefore, even if the Court finds the Release enforceable, its terms do not encompass the Borat Movie which is a work of satire, comedy or fiction. Even if the term "documentary-style" is not misleading, at the very least it is an ambiguity that goes to the heart of this dispute, cannot be resolved at this early stage of the case and cannot conceivably be the basis for an Order dismissing the Complaint.

Second, the general merger clause and disclaimers contained in the Release do not bar Mrs. Martin's claims of fraudulent inducement. Defendants had peculiar knowledge as to the true nature of the Borat Movie that they had a duty to disclose to Mrs. Martin. By virtue of their failure to disclose, Mrs. Martin had no way of ascertaining the truth about what she was getting herself into and was completely in the dark as to the true nature of the Hollywood blockbuster in which she was about to unknowingly star.

6

A.    **The Release Is Deliberately Misleading, Is Unenforceable And Does Not Contradict the Claims Of Fraud In The Complaint.**[1]

In relevant part, the Release provides that:

"[t]he Participant agrees to be filmed and/or taped by the Producer for a documentary-style film (the "Film").  It is understood that the Producer hopes to reach a young adult audience by using entertaining contents and formats."

Release ¶ 1.

Just as the producer of the Borat Movie was not Springland (as the Release provides), the subject matter of the movie Mrs. Martin had agreed to participate in was not "documentary-style" (as the Release provides). As such, the Release is unenforceable. See Cahill v. Regan, 5 N.Y.2d 292, 184 N.Y.S.2d 348 (1959); Demaria v. Brenhouse, 277 A.D.2d 344, 345, 716 N.Y.S.2d 99,100 (2d Dep't 2000) (a release may not be read to cover matters which the parties did not intend it to cover).

In Psenicska v. Twentieth Century Fox Film Corp., et al; Case No. 07 Civ. 10972, Plaintiff Michael Psenicska, another victim of Defendants' fraud, develops a line of argument demonstrating how the words in paragraph 1 of his identically worded release do not come close to describing the true nature of the Borat Movie. See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint, dated April 8, 2008; pp.4-9; Psenicska v. Twentieth Century Fox Film Corp., et al; Case No. 07 Civ. 10972 ("Psenicska Brief in Opp."). He further argues that, in seeking to

---

[1]  As a preliminary matter, any contention by Defendants that the Alabama Supreme Court recognized the enforceability of the Release as a whole is misleading.  The Alabama proceedings at both the trial and appellate level focused solely on the limited issue of the enforceability of the forum-selection clause in the Release, specifically whether or not Defendants were primarily engaged in intrastate commerce and therefore subject to Alabama's door closing statute.  Under Alabama law, whether or not the Release as a whole was fraudulently induced is not an issue the court can consider with regard to a forum selection clause. Ex parte Procom Services, Inc., 884 So.2d 827, 832 (Ala. 2003).  As such, the Alabama Supreme Court's limited review of the enforceability of the forum selection clause in the Release can not be construed as an endorsement of the portions of the Release presently before this Court.

enforce the Release, Defendants attempt to conjure a whole new meaning for the words Defendants chose to use. Id. at p. 4.

More specifically, using the dictionary definitions of the word "documentary" and "style," together with an appraisal of what, typically, has constituted a "documentary" in modern cinema, Psenicska argues convincingly that the term "documentary-style" is misleading when viewed in the context of the Borat Movie. Id. Further, Psenicska argues that the Defendants expression of hope in the Release to reach a young adult audience with "entertaining" content does not lead to a contrary conclusion. Id. at p. 5-6. Citing to a number of documentary movies aimed at young adults, Psenicska argues that young people are more than capable of finding serious treatment of a topical issue to be entertaining. Id. Plaintiff adopts and incorporates the arguments articulated by Psenicska as if set forth fully herein. See Psenicska Brief in Opp., pp.4-9. Richards Decl., Exh. A.

Defendants point to the fact that the Borat Movie was nominated for the Best *Non-Fiction* Award by the New York Film Critics Circle, as if that is somehow conclusive evidence of the accuracy of the wording of the Release. It is not.

First the only "non-fiction" aspect of the movie is its accurate portrayal of the Defendants' ability to defraud multiple victims for their own benefit. Further, in addition to the New York Film Critics Circle nomination, Defendant Baron-Cohen was nominated for, and won, the 2007 Golden Globe Award for Best Actor: *Musical or Comedy*. Mr. Baron-Cohen's fellow nominees were Johnny Depp, for "Pirates of the Caribbean: Dead Man's Chest," Aaron Eckhart for "Thank You For Smoking," Chiwetel Ejiofor for "Kinky Boots" and Will Ferrell for "Stranger than Fiction." http://www.goldenglobes.org/nominations/year/2006 (last viewed June 4, 2008). The

Borat Movie was also nominated for Best Motion Picture in the same category. Id. Its fellow nominees were "The Devil Wears Prada," "Dreamgirls," "Little Miss Sunshine" and "Thank You For Smoking." Id. None of these movies could even remotely be described as a "documentary" or "documentary style." Yet, taking their argument here to its logical extreme, apparently that is what Defendants would have the Court believe here.[2]

Similarly, the movie was also nominated for Best Adapted Screenplay at the 79th Academy Awards. http://www.oscars.org/79academyawards/nomswins.html (last viewed June 4, 2008). An adapted screenplay is defined by the fact that it is a screenplay adapted from another source (usually a novel, play, or short story but also sometimes another film). http://en.wikipedia.org/wiki/Academy_Award_for_Writing_Adapted_Screenplay (last viewed June 4, 2008). Plainly, this does not fit into the notion of the movie being in "documentary-style" format.

Finally, for further, and perhaps conclusive, evidence that the Borat Movie is not one made in a "documentary-style," the Court need only look to the words of Mr. Baron-Cohen himself. In a rare interview with England's Daily Telegraph, lamenting the demise of his Borat character, Mr. Baron-Cohen states:

> It is hard, and the problem with success, although it's fantastic, is that every new person who sees the Borat movie is one less person I "get" with Borat, so it's a self-defeating form, really.
>
> http://www.telegraph.co.uk/arts/main.jhtml?xml=/arts/2007/12/21/bfborat121.xml (last viewed June 4, 2008).

---

[2] For further evidence that the Borat Movie is more deserving of a comedic or satirical definition, the Court need look no further than the UK's definitive film guide, Halliwell's, which describes the movie as "a spoof." See Gritten: Halliwell's Film Video & DVD Guide 2008 at p. 151 (Harper Collins 2007). Richards Decl., Exh. B.

For sure, Mr. Baron-Cohen's "getting" of people is referring to the form of "comedy" for which Mr. Baron-Cohen's characters have become so notorious. Most certainly, however, the "getting" of innocent people for satirical purposes has nothing whatsoever to do with the documentary genre to which Defendants claim the Borat Movie belongs.

Plaintiff submits that Mr. Baron-Cohen's words should be given greater weight here than the dicta expressed by the Courts in California and in Mississippi upon which Defendants rely in their moving papers.

Defendants' reliance on <u>Weil v. Johnson</u>, No. 119431/02, 2002 WL 31972157 (Sup. Ct. N.Y. Co., Sept. 27, 2002) only strengthens Mrs. Martin's argument here. First, as the Court in <u>Weil</u> found, the release in question provided on its face that the movie "was a commercial production being undertaken by a professional studio based in Beverly Hills, California" and was entered into with Black River Films, Inc., the producer of the movie. <u>Weil</u>, at *2. Mrs. Martin's Release misrepresents that the producer was Springland Films, when in fact it was Defendant One America. Further, in <u>Weil</u>, unlike here, the film in which the plaintiff had agreed to appear was exactly that which had been described to him by the (real) producers beforehand.

**B.    Even If The Term "Documentary-Style Film" Is Not Found To Be Misleading, It Is An Ambiguity Which Cannot Be Resolved On Defendants Motion As A Matter Of Law.**

Because "[t]he 'law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing],' a release which purports to excuse a party from responsibility for misconduct is subject to the 'closest of judicial scrutiny'" <u>Golden Pacific Bancorp. v. Fed. Deposit Ins. Corp.</u>, 273 F.3d 509 (2d Cir. 1993)

10

(citations omitted) (release is a species of contract governed by principles of contract law).

Due to the heightened level of judicial scrutiny of releases, "an ambiguous release may not form the basis for a motion to dismiss." Information Superhighway, Inc. v. Talk America, Inc., 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003) (denying motion to dismiss where release was ambiguous as to the acts to be released); see also Integrated Book Technology, Inc. v. T/R Systems, Inc., 2 A.D.3d 1193, 1195, 770 N.Y.S.2d 186, 187 (3rd Dep't 2003) (affirming trial court's denial of motion to dismiss where release was ambiguous as to what was being released); Doldan v. Fenner, 309 A.D.2d 1274, 765 N.Y.S. 2d 401 (4th Dep't 2003) (finding that the term "no fault" in a release could be ambiguous to a lay-person entering into a release waiving certain personal injury claims).

Moreover any ambiguities must be construed against Defendants as the drafters of the Release. Lifson v. INA Life Ins. Co. of New York, 333 F.3d 349, 353 (2d Cir. 2003).

As set forth in Point IIA, *infra*, the Borat Movie has been subject to a host of different descriptions and, as a genre, it is virtually impossible to pigeon-hole. Defendants contend that the movie is more akin to a documentary type of movie. Plaintiff, as well as movie critics and journalists, have ascribed a wholly different label to the film, claiming it to be a crude satire, spoof, or comedy. Thus, under the law of New York, at best, Defendants can claim only that the wording of the Release used to describe the movie is ambiguous. Accordingly, the motion should be denied. See Golden Pacific Bancorp., 273 F.3d at 515-16 ("'[w]here contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact … [t]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively

11

by a reasonably intelligent person who has examined the context of the entire integrated agreement.'") (internal citations omitted).

### C.    The Merger Clause And Disclaimers In The Release Do Not Bar Plaintiff's Claims.

Defendants rely upon a general merger clause in the Release to argue that Mrs. Martin disclaimed the extensive and intentional misrepresentations made to her.   The merger clause provides as follows:

> This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

Release ¶ 5.

Under New York law, this provision does not act as a bar to Mrs. Martin's claims.

"New York law provides that '[e]ven an express disclaimer will not be given effect where the facts are peculiarly within the knowledge of the party invoking it.'" Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank, 819 F. Supp. 1282, 1292 (S.D.N.Y. 1993) (citations omitted).  "As a general rule, '[w]hen matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely [on defendant's representations] without prosecuting an investigation, as he has no independent means of ascertaining the truth." Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. 1980); accord Solutia v. FMC Corp., 456 F. Supp. 2d 429, 448  (S.D.N.Y. 2006) (defendants found to have peculiar knowledge of facts not disclosed even though both parties represented by experienced corporate counsel and a negotiated a 39 page contract entered into). The factors relevant to this inquiry include the plaintiff's level of sophistication and access to the information underlying the alleged misrepresentation.

Dimon Incorporated v. Folium, Inc., 48 F.Supp.2d 359, 368 (S.D.N.Y. 1999) (disclaimer did not bar fraud claims even though case involved "extremely sophisticated parties" who were represented by "able counsel [and] had access to the resources and specialized skills necessary to conduct a quite thorough review of the financial records" at issue).

Putting aside the fact "the Film" as defined in the Release and as referred to in the merger provision does not properly identify what, exactly, Mrs. Martin had agreed to participate in, there can be no doubt that the facts pertinent to this inquiry were not only peculiarly within Defendants' knowledge, but that Defendants went to great lengths to hide them. In order to hoodwink Ms. Martin into signing the Release, Defendants went as far as to conceal Schulman's true identity from Mrs. Martin, conceal Defendant One America's role as the producer of the movie, misrepresent the purpose of the filming, and, of course, conceal Mr. Baron-Cohen's involvement. Defendants' trickery in relation to Mrs. Martin was clearly long in the planning, well-conceived and fits the pattern of others who were similarly deceived by Defendants,[3] and for good reason.

Four years prior to the Borat Movie, Ali G, one of Mr. Baron-Cohen's other well-known alter egos, starred in the movie "Ali G Indahouse." Like Borat, Ali G's popularity was based upon ambushing unsuspecting individuals. During the course of the interviews, he either embarrasses his interviewee by displaying a mixture of uninformed political incorrectness, or gets the interview "victim" to agree to some breathtaking inaccuracy or insult. See http://en.wikipedia.org/wiki/Ali_G. (last viewed June 4, 2008).

---

[3] At least two other cases involving claims similar to Mrs. Martin's are pending before this Court. Psenicska v. Twentieth Century Fox Film Corp., et al; Case No. 07 Civ. 10972 and Streit v. Twentieth Century Fox Film Corp., et al; Case No. 08 Civ. 01571. In both cases the respective plaintiffs were told a false story almost identical to that told Mrs. Martin. Likewise, they were presented with identically worded releases almost immediately prior to filming which, under the circumstances, all but prevented them from conducting any meaningful investigation, much less obtaining legal advice, as to the possible ramifications of entering into Defendants' Release which, as Defendants concede in their brief, was carefully and clearly worded (presumably to play into the fraud they were about to perpetrate).

However, "Ali G Indahouse" eschewed this format for a typical plot and story-line, albeit in comedy format.  All the performers in the movie were paid professionals. The movie was a critical and commercial flop and was not even shown in the Unites States.[4]

The producers of the Borat Movie clearly had to devise a way of preying on unsuspecting individuals in the format that had initially brought popularity to Baron-Cohen both as Ali G and Borat. Without this, the Borat movie would have reached a fate similar to that of "Ali G Indahouse." Against this, Mrs. Martin, unsophisticated in the ways of the "players" involved here, had no chance.  Even if she had been given the time and opportunity to look into the matter further, she would not have discovered anything because of Schulman concealing his true identity as well as that of One America and Baron-Cohen.

Indeed, Schulman's failure to disclose his true identity (and signing the Release using a false name) is grounds alone to deny the motion.  For example, in <u>Starr v. Johnsen</u>, 143 A.D.2d 130, 132, 531 N.Y.S.2d 589, 591 (2d Dep't 1988), after a car accident the plaintiff executed a release waiving claims against "Leonard Johnsen," the driver of the other car. When she subsequently discovered her injuries to be worse than initially thought, she brought suit against "Stanley L. Johnsen," the registered owner of the car.  Moving to dismiss Johnsen's affirmative defense of release, Stanley L. Johnsen opposed attesting that he was actually called "Lenny" or "Leonard" and that he was the "Leonard Johnsen" named in the release.

---

[4] "The joke has worn thin and [Baron-Cohen's] feature debut, Ali G Indahouse, like most big screen spin-offs from British TV shows, is a crude, shoddy affair." The Guardian.  Cohen "flaps from sketch to sketch like a slapstick clown." The Times.  A "lumpen script." The Independent. http://news.bbc.co.uk/2/hi/entertainment/1892803.stm (last viewed May 27, 2008).

The <u>Starr</u> court found that "[a]lthough the defendant is free to assume whatever name he chooses, he may not by doing so interfere with the rights of others."  143 A.D.2d at 132, 531 N.Y.S.2d at 591.  The Court ordered a trial to be held on the issue of the release, finding that Johnsen "was under a duty at the time of the accident to disclose his true identity." <u>Id</u>.

<u>Starr</u> is squarely on point here.  "Todd Lewis" was under a duty to reveal to Mrs. Martin not only that he was, in fact, Schulman, but also that his employer was not Springland, but One America, and the true intent of the filming (i.e. to embarrass her and the others).  This would have at least given Mrs. Martin the opportunity to conduct some sort of investigation into with whom or what she was entering into what Defendants now claim to be a binding agreement. In fact a Google search of Schulman's real name at that time would have revealed his involvement in the Borat Movie. Complaint ¶ 62.

In sum, the merger provision and disclaimers in the Release simply do not operate as a bar to any of Mrs. Martin's claims, much less her claims for fraud.[5]  At the very least, Mrs. Martin has raised questions of fact as to the effect of the disclaimers at issue here.  Any dispositive decision on this issue now would be premature prior to any discovery having been taken on the issue. <u>See</u>, <u>e.g.</u>, <u>Comi v. Breslin & Breslin</u>, 257 A.D.2d 754, 683 N.Y.S.2d 345 (3rd Dep't 1999) (summary judgment denied where plaintiffs alleged that financial records provided prior to sale of corporation purchased

---

[5] Even if the Complaint did not state a claim for fraud, there is ample authority to support a denial of Defendants' motion to dismiss under the facts and circumstances alleged in the Complaint. <u>See</u> <u>Starr</u>, 143 A.D.2d at132, 531 N.Y.S.2d at 591 ("[t]he general requirement that a release be fairly and knowingly made has been extended to situations falling short of actual fraud on the part of the releasee"); <u>Haynes v. Garez</u>, 304 A.D.2d 714, 715, 758 N.Y.S.2d 391, 393 (2d Dep't 2003) (same); <u>see also</u> <u>Bloss v. Va'ad Harabonim of Riverdale</u>, 203 A.D.2d 36, 40, 610 N.Y.S.2d 197, 200 (1st Dep't 1994) (even where the releasee is represented by counsel, "[i]t is inequitable to allow a release to bar a claim where, as here, it is alleged that the releaser had little time for investigation or deliberation and that it was the result of overreaching or unfair circumstances"); <u>accord</u> <u>Gibli v. Kadosh</u>, 279 A.D.2d 35, 717 N.Y.S.2d 553 (1st Dep't 2000); <u>Rivera v. Vickers</u>, 72 A.D.2d 807, 421 N.Y.S.2d 918 (2d Dep't 1979).

contained false entries and those misrepresentations resulted in an inability to ascertain corporation's true financial obligations, even though disclaimer of warranties as to corporation's financial situation had been executed); accord Cleangen Corp. v. Filmax Corp., 3 A.D.3d 468, 772 N.Y.S.2d 692 (2d Dep't 2004); Joseph v. NRT Incorporated, 43 A.D. 3d 312, 841 N.Y.S.2d 38 (1st Dep't 2007).

### III.    PLAINTIFF STATES A VALID CLAIM FOR UNJUST ENRICHMENT

"To state a claim for unjust enrichment, a plaintiff must allege that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience requires defendants to make restitution." Louros v. Cyr, 175 F. Supp. 2d 497, 514, n. 8 (S.D.N.Y. 2001) (Preska, J.). "'The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'" Federal Deposit Ins. Corp. v. First International Bank., 1999 WL 1114692, No. 98 Civ. 8374 (LLS) (S.D.N.Y., Dec. 7, 1999) quoting Paramount Film Distributing Corp. v. State of New York, 30 N.Y.2d 415, 334 N.Y.S.2d 388 (1972).

For at least two reasons, the inquiry here should be resolved in favor of Mrs. Martin. First, without the likes of unwitting victims such as Mrs. Martin there would have been no Borat Movie. As Mr. Baron-Cohen admits, the success of the Borat character is wholly dependent on Mr. Baron-Cohen's ability to "get" his unknowing participants.[6] Unquestionably, Mr. Baron-Cohen and his co-defendants succeeded in "getting" Mrs. Martin and they "got" her good. The segment involving Mrs. Martin

---

[6] Halliwell's describes the movie as having "[a]n unquestionably clever premise, with a straight-faced, apparently naïve foreigner eliciting outrageous, embarrassing responses from innocent, well-meaning and often reactionary Americans not in on the gag." See Gritten: Halliwell's Film Video & DVD Guide 2008 at p. 151 (Harper Collins 2007). Richards Decl., Exh. B.

16

(which prominently features Mrs. Martin's name on screen) was used repeatedly in the advertising and promotion of the movie not only in movie theatres, but in all types of entertainment media including on the Internet and on cable television. Complaint ¶ 54. It is beyond doubt that the success of the film was, in large part, made off the backs of Mrs. Martin and the other unwitting participants. Mrs. Martin, as Defendants acknowledge, was paid the sum of $350.00 for providing dining etiquette services. Complaint ¶ 55. In comparison, at the time of filing this action, the film had made hundreds of millions of dollars in profits and the movie was ranked as Number 212 on the list of highest grossing movies of all time. Complaint ¶ 56.

Second, unlike Mrs. Martin and the other unwitting stars, some of the participants in the movie were in on Defendant's scheme. Defendants selectively disclosed the design, theme, plot, purpose and intent of the scheme of the Borat Movie to professional actors and/or actresses. Complaint ¶ 66. Professional actors and/or actresses including Cohen, Pamela Anderson, Luenell Campbell (aka Jane Sanguinetti Luenell) and Ken Davitian were given an opportunity to review the script and knowingly participate in the Borat Movie. They had the option of deciding whether or not to have their names, images and likenesses associated with this R-rated film. Mrs. Martin was never given that opportunity and will forever suffer as a result. Complaint ¶ 66.

Under these circumstances, Mrs. Martin has more than stated a claim for unjust enrichment here. Equity and good conscience demand that appropriate restitution should be made to her.

Defendants do not argue that that Mrs. Martin has failed to state a claim for unjust enrichment. Rather, they argue that Mrs. Martin's unjust enrichment claim is somehow

precluded by New York Civil Rights Law Section 51. But Section 51 does not apply here and has no bearing on Plaintiff's unjust enrichment claim. Mrs. Martin does not dispute that she signed the Release or that she gave authorization for the use of her dining etiquette training. Her dispute is about two issues. The first is the fraud perpetrated upon her in order to obtain her agreement for the use of her image; the second, that her likeness was hijacked and her image portrayed in a manner far beyond that contemplated by her, by the terms of the Release and most certainly by the representations made to her by Schulman prior to her executing the Release.[7] Complaint ¶ 68.

Defendants also claim that in accepting the $350 for providing dining etiquette services and her participation in her scene, Mrs. Martin's unjust enrichment claim is barred under the doctrine of accord and satisfaction. This argument is meritless because it has long been the case that where, as here, one party fails to disclose superior knowledge in their possession under circumstances where a disclosure should have been made, equity precludes a valid accord between them. Ryon v. Wanamaker, Inc., 116 Misc. 91, 99, 190 N.Y.S. 250, 254 (Sup. Ct., N.Y. Co. 1921), aff'd 202 App.Div. 848, 194 N.Y.S. 977 (2d Dep't 1922), aff'd 235 N.Y. 545, 139 N.E. 728 (1923).

Defendants are unable to demonstrate how Plaintiff's unjust enrichment claim is precluded by Section 51 or by the doctrine of accord and satisfaction. Therefore, because Defendants do not argue that Mrs. Martin fails to state an unjust enrichment claim, the

---

[7] Defendants' attempt to cast this case in the same light as the Lemerond case recently decided by this Court. Lemerond involved section 51 and common law claims for the unlawful use of the plaintiff's image, claims which are not asserted here. There was no release involved, and no claims alleging the type of fraudulent activities that are alleged here. Lemerond v. Twentieth Century Fox Film Corp., No. 07 Civ. 4635 (LAP), 2008 WL 918579 (S.D.N.Y. Mar. 31, 2008). Thus, there is no comparison between that case and this.

claim must stand.  See Louros, 175 F. Supp. 2d at 514 (motion to dismiss denied where defendants did not argue plaintiff failed to plead elements of an unjust enrichment claim).

**IV    PLAINTIFF HAS STATED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Mrs. Martin does not dispute that New York Courts set the bar high in order for a claim for intentional infliction of emotional distress (IIED) to proceed. However, this case is the unusual one where the standards set for the pleading of such a claim have been met.  The Court need only look to its opinion in the Lemerond case.

There, as Defendants point out, this Court held as follows:

> The movie challenges its viewers to confront, not only the bizarre and offensive Borat character himself, but the equally bizarre and offensive reactions he elicits from "average" Americans
>
> Lemerond v. Twentieth Century Fox Film Corp., No. 07 Civ. 4635 (LAP), (S.D.N.Y. Mar. 31, 2008), at 6.

As the Court notes, many of the participants in the movie exhibited offensive and reactionary behavior when confronted with the Borat character and the movie has been lauded for its expose of "reactionary Americans."  See Halliwell's, id., at p. 151. Mrs. Martin has, and will always be, lumped in with those participants who exhibited the reactionary behavior to which the Court alludes in its Lemerond decision.  Certainly, Mrs. Martin's reputation as a kind and decent woman has been forever tarnished by her involuntary association with the vulgarities repeatedly exhibited in the film.  Mrs. Martin has not only had to explain her appearance in the movie to her young daughter, but she has been repeatedly approached to the point of harassment by national and international media, friends, colleagues and strangers about her role in the Borat Movie. Complaint ¶ 72.

19

Mrs. Martin's humiliation will not dissipate over time either. The movie is now shown regularly on TV and will continue to air publicly due to the imminent release of another movie featuring "Bruno the flamboyantly gay Austrian interviewer," another of Mr. Baron-Cohen's characters. See http://www.huffingtonpost.com/2008/05/19/bruno-sacha-baron-cohen-t_n_102416.html (last viewed June 5, 2008). This is exactly the type of "day in day out harassment" that New York Courts look for in order to properly state a cause of action for IIED. See Nunez v. A-T Fin. Info. Inc., 957 F. Supp. 438, 442 (S.D.N.Y. 1997) (Preska, J.) (relied upon by Defendants). The fact that during Mrs. Martin's scene, she was shown a series of pornographic pictures by Cohen purporting to be his son, who she remembers him saying was fifteen (15) years old at the time (the pictures of Cohen's son depicted a boy exposed from the waist down and focused on the child's penis) only makes matters worse.

The IIED claim should be allowed to proceed.

## Conclusion

For all the foregoing reasons, Defendants' motion should be denied in its entirety.

Dated: New York, New York
     June 6, 2008

Respectfully submitted,

ADAM RICHARDS LLC

By:   /s Adam Richards
      Adam Richards (AR-2489)
      Attorneys for Plaintiff
      Kathie Martin
      40 Fulton Street, 7th Floor
      New York, New York 10038
      (212) 233.4400